THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM PATTEN, Defendant-Appellant.

First District (1st Division)   No. 1—91—0457

Opinion filed December 28, 1992.

Randolph N. Stone, Public Defender, of Chicago (Murray M. Coffey and Karen E. Tietz, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Jane Mahoney, Special Assistant State's Attorney, and Renee Goldfarb and Theresa Harney, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant William Patten was found guilty of child abduction. The trial judge sentenced defendant to two years in the Illinois Department of Corrections and one year of supervised release. The issues defendant raises on appeal are: (1) that defense counsel's delay in amending his answer to discovery to include expert psychiatric testimony denied defendant effective assistance of counsel; and (2) that he was denied a fair trial when the judge failed to exercise his discretion and give a meaningful answer to a question asked by the jury during its deliberations.

On September 26, 1990, at approximately 7 p.m., 11-year-old K.H. and nine-year-old P.H. were playing on the front porch of a house at 1147 South Albany. P.H.'s three-year-old sister was outside with them and their 13-year-old baby sitter M.R. had just gone inside to answer the telephone. The children both testified that a "reddish maroon" car slowly drove by, stopped, and reversed back to the house. They testified that the man inside the car made a gesture for them to come toward the car. K.H. stated that she heard him say "come." P.H. testified that he heard the man say "come here." According to the children, K.H. started screaming and they both grabbed the three-year-old and ran inside the house. M.R. then called the police. At the police station, K.H. and P.H. both identified the defendant's car as the one that had been driven by the house. Additionally, K.H. identified the defendant in a lineup and again later she identified him in court as the man in the vehicle.

On cross-examination, defense counsel showed the children a poster which had been distributed in front of the school and posted around the neighborhood *prior* to the day in question. The poster had a picture of defendant, a description of his car, his license number and warned kids to stay away from him because he was a "very bad man with children." Both K.H. and P.H. admitted that they had seen the poster before and knew what it said. K.H. testified she had seen a copy of the poster in her own house. Additionally, the children's parents had warned them to stay away from defendant.

The baby sitter, 13-year-old M.R., testified that she had gone inside to answer the telephone when she heard the other children

screaming and running up the steps into the house. She called the police after they told her what had happened. She stated that she never gave defendant permission to put the children in his car. On cross-examination, M.R. admitted that she had seen the poster warning them to stay away from defendant posted all around the neighborhood and that all the children were aware of it.

K.H.'s mother and P.H.'s father both testified that neither they nor their spouses had ever given defendant permission to put the children in his car. Additionally, they both stated that their children had seen the poster prior to the incident. They also testified that they had expressly discussed it with their children and warned them about the person pictured on the poster.

Detective James Butler testified that he interviewed each child separately and that both children identified defendant from a photo array as the man who had attempted to lure them into his car. He also stated that he was a witness to K.H.'s lineup identification of defendant.

Officers Wayne Conley and Gerald Pustay testified that they were called to investigate the case at approximately 7:20 p.m. on September 26, 1990. They were informed by Detective Butler that K.H. had identified defendant as the person who had attempted to lure the children into his car. The officers proceeded to defendant's home, where they observed defendant's red Mustang in the driveway. They knocked on the door, but received no response. They then set up surveillance of the home. According to the officers, about 20 minutes later, defendant exited his house. The officers testified that when defendant saw them coming toward him he ran back up the driveway toward the back of his house. Officer Pustay overtook defendant and arrested him. Officer Conley took defendant's keys and drove his red Mustang to Area 2 headquarters.

The State then introduced the testimony of three witnesses for the limited purpose of showing defendant's *modus operandi* and intent. E.L., a 10-year-old girl, and B.M., a 10-year-old boy, testified that on May 27, 1990, at approximately 2:40 p.m., they were playing on the sidewalk on the corner of 114th and Whipple when defendant drove up in a red Mustang. According to E.L. and B.M., defendant opened the car door, reached out toward them and asked them for a kiss. The children stated that they ran from defendant. Detective Waliczek testified that he conducted a photo lineup first at E.L.'s home and then shortly thereafter at B.M.'s home. Both children identified defendant as the man who attempted to kiss them. Waliczek also stated that the children identified defendant in a physical lineup.

Defendant called his mother, father, and brother on his behalf. His father testified that defendant was at home at 7 p.m. on September 26, 1990, and at approximately 2:40 p.m. on May 27, 1990. He also stated that he had seen the posters around the neighborhood alleging that his son was a child molester and he had torn down at least 35 of them. Defendant's brother also testified that defendant was at home at 7 p.m. on September 26, 1990, and at 2:40 p.m. on May 27, 1990. Defendant's mother also testified that defendant was home at the time of the alleged occurrence on September 26, 1990.

Finally, defendant testified on his own behalf. He stated that on the night of the incident he was sick and went to the drugstore to purchase some medication at approximately 6:30 p.m. He testified that the route he followed did not take him within the vicinity of 1147 South Albany. According to defendant, he returned home at approximately 6:45 p.m. He testified that he took the medicine and lay down. He then got up several hours later and went out to get some fresh air. According to defendant, as he was walking down his driveway, he noticed a car parked down the block. At that same moment he heard a telephone ring and turned to run back into the house to answer the phone. He stated that he was about to open the door when the police told him to "halt." He testified that he had never seen K.H. or P.H. prior to seeing them at the police station that night. He further stated that he was at home on May 27, 1990, at 2:40 p.m. and that he had never seen B.M. or E.L. before.

The jury found defendant guilty of both counts of child abduction. Defendant filed a motion for a new trial and a motion in arrest of judgment. Both motions were denied.

Defendant's first argument on appeal is that trial counsel's delay in amending his answer to discovery to include expert psychiatric testimony denied him the effective assistance of counsel.

Prior to trial, defendant filed his answer to the State's pretrial discovery request. Defendant asserted that he would present an alibi defense at trial and would establish that he was at home at 3521 West 105th Place with his parents and his brother. He stated in his answer that he intended to call "any physicians who have examined and treated the defendant." He did not list, however, any expert psychiatric witnesses.

On January 8, 1991, just before the trial began, defense counsel asked the court for an opportunity during the course of the trial to have a psychiatrist examine defendant and then testify. The prosecutor objected, arguing that defendant had asserted alibi as a defense. In addition, the prosecutor objected because the State's expert would

not have time to examine defendant. The trial judge reserved his ruling until "the appropriate time." At the start of the second day of trial on January 9, 1991, defense counsel again requested defendant be examined by a psychiatrist. Over the State's objections, the trial judge allowed defendant to be examined by a psychiatrist during the lunch recess.

After lunch and before the jury was called back, defense counsel made an offer of proof in regards to the psychiatric testimony. Defense counsel offered that Dr. Paul Lawler, a specialist in psychiatry for 20 years, would testify that he had examined defendant and defendant's mother, father, and brother, and had reviewed the reports of the court's psychiatrist. He would further testify that, in his opinion, defendant has some psychosis, some degree of retardation, and a diminished level of intelligence. He also would state that defendant was a loner who had difficulty dealing with people, but that, in his opinion, defendant had no sexual dysfunction related to young children and is no danger to himself or to others.

The State objected to Dr. Lawler's testimony on three grounds. First, the prosecutor asserted that it was not indicated that Dr. Lawler would testify that defendant's diminished level of intelligence and slight retardation mean that defendant did not know right from wrong. Second, the prosecutor argued that since defendant was asserting an alibi defense and not an insanity defense, the doctor's testimony was irrelevant. Finally, the prosecutor maintained that the State had not received sufficient notice and, therefore, could not rebut Lawler's testimony. The trial judge denied defendant's motion to amend his list of witnesses and refused to allow Dr. Lawler to testify on the ground that defendant had not offered any satisfactory explanation as to why Dr. Lawler's name was not furnished earlier than on the second day of trial and just one witness away from the State resting its case.

■ Defendant contends that trial counsel's delay in amending his answer to discovery to include the name of Dr. Lawler, a psychiatrist, as a potential defense witness was ineffective assistance of counsel. According to defendant's argument, if the jury had heard Dr. Lawler's testimony regarding defendant's mental retardation and diminished mental capacity, it would have found that defendant did not possess an unlawful purpose as required by the child abduction statute and the outcome of the trial would have been different. Defendant reasons that without Dr. Lawler's testimony, however, it was impossible for the jury to have found in defendant's favor. "Child abduction" is defined in section 10—5(b)(10) as follows:

"(b) A person commits child abduction when he or she:
* * *
(10) Intentionally lures or attempts to lure a child under the age of 16 into a motor vehicle, *** without the consent of the parent or lawful custodian of the child for other than a lawful purpose." (Ill. Rev. Stat. 1989, ch. 38, par. 10—5(b)(10).)
The State counters that defense counsel gave defendant the best assistance possible by presenting a solid alibi defense. Alternatively, if failure to list the psychiatrist as a potential witness rendered counsel's performance substandard, the State maintains that this "defect" would not have altered the outcome of the trial.

■ In order for a defendant to establish on appeal that he has received ineffective assistance of counsel, he must show (1) that his attorney's performance "fell below an objective standard of reasonableness," and (2) that, as a result of counsel's substandard performance, he was deprived "of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984), 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255.) In order for a defendant to show that he did not receive a fair trial, he must show more than just that his counsel's errors or omissions "had some conceivable effect on the outcome of the proceeding." (*Strickland*, 466 U.S. at 693, 80 L. Ed. 2d at 697, 104 S. Ct. at 2067.) He must show that, but for defense counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. (*Albanese*, 104 Ill. 2d at 525, 473 N.E.2d at 1255, citing *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) Obviously, therefore, this does not mean a defendant is entitled to perfect representation, but he is entitled to counsel who will subject the prosecution's case to "meaningful adversarial testing." *United States v. Cronic* (1984), 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047; *People v. Williams* (1991), 215 Ill. App. 3d 800, 811, 576 N.E.2d 68, 75; *People v. Barfield* (1989), 187 Ill. App. 3d 190, 197-98, 543 N.E.2d 812, 816.

■ In addition, in order to avoid the "distorting effects of hindsight," there is a "strong presumption" that defense counsel's performance "[fell] within the wide range of reasonable professional assistance." (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) In explaining this "highly deferential" standard, the *Strickland* Court observed:

"It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *** There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citation]." (*Strickland*, 466 U.S. at 689-90, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065-66.)

The *Strickland* Court reasoned that if courts engaged in greater scrutiny of defense counsel's performance, "[c]riminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense." *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; *Albanese*, 104 Ill. 2d at 526, 473 N.E.2d at 1255.

■ After reviewing the record, we cannot say that counsel's failure to amend his answer to the State's pretrial discovery to include Dr. Lawler's name was ineffective assistance of counsel. Defendant's defense at the time he answered discovery and throughout trial was alibi. Defendant obviously told his attorney that "he did not do it." At trial, he testified that he was at home at the time of the incident. Additionally, his mother, father, and brother all corroborated his story that he was at home at 7 p.m. on September 26, 1990. Moreover, defense counsel vigorously cross-examined every witness and discredited their testimony as best he could by bringing out the fact that, prior to identifying defendant as the perpetrator, both the children and the police were aware of posters with defendant's picture, license number, and description of his car which had been distributed throughout the neighborhood and which accused him of being a child molester.

Clearly, Dr. Lawler's testimony that defendant had a diminished level of intelligence and slight retardation is irrelevant to whether or not defendant was at home at the time of the incident. Defense counsel's alibi defense was supported not only by the defendant's testimony, but also by three other witnesses. Counsel acted as a vigorous advocate for defendant and, as illustrated by his cross-examinations of the State's witnesses, subjected the prosecution's case to "meaningful adversarial testing."

Defendant's assertion that without Dr. Lawler's testimony it was impossible for the jury to find him not guilty is simply not true. There was more than sufficient evidence in the record for the jury to have acquitted defendant based on his alibi defense. As the *Strickland* Court foresaw would occur in numerous cases when it established that

judicial scrutiny of defense counsel's performance must be "highly deferential," defendant here, with the distorting effects of hindsight as a guide, has succumbed to the temptation to second-guess his counsel's unsuccessful defense and concluded, all too easily, that the failure to present Dr. Lawler's testimony was unreasonable. (See *Strickland*, 466 U.S. at 689-90, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065-66.) There is no basis, however, for this conclusion. This is exactly the reason why there is a strong presumption that counsel's representation fell "within the wide range of reasonable professional assistance." Clearly, Dr. Lawler's testimony would not have hurt defendant's case, but we cannot say that failure to present it, in light of the circumstances, was incompetent representation.

Assuming *arguendo* that defense counsel's performance was deficient, we do not believe it prejudiced defendant and deprived him "of a fair trial, a trial whose result is reliable." First, defendant's defense was alibi and not insanity. Dr. Lawler's testimony that defendant had a diminished level of intelligence and slight retardation is irrelevant to whether he attempted to lure the children into his vehicle. Second, Dr. Lawler's testimony went to defendant's mental capacity and not his mental state at the time of the incident. Defendant's offer of proof as to what Dr. Lawler's testimony would be did not indicate that he would state that defendant's mental capacity precluded him from being able to formulate the unlawful intent required under the child abduction statute or that he did not know right from wrong. We believe it highly speculative to conclude that the absence of Dr. Lawler's testimony had an effect on the judgment. See *People v. Nevitt* (1990), 135 Ill. 2d 423, 460-61, 553 N.E.2d 368, 383-84 (defense counsel's failure to properly list witness on defendant's answer to State's discovery not ineffective assistance where testimony would not have affected the outcome of the trial).

■ Additionally, defendant asserts that the question the jury asked the judge during deliberations clearly demonstrated that the jury wanted to find defendant not guilty. During the course of its deliberations, the jury sent the following question to the trial judge:

"Is there a technical reason why character witnesses for Mr. Patten were not brought in by the defense, or was that simply the defendant's choice—overlooked?"

After discussing possible responses with defense counsel and the prosecutor, the trial judge sent back the following answer:

"Please review your instructions. The court cannot answer your question. At the conclusion of the trial you may talk to the attorneys if you so desire."

We do not agree with defendant that the jury's question to the judge during deliberations presumptively establishes that it was searching for a way to acquit defendant. We cannot say that the jury's question to the judge during deliberations as to why defendant did not present any *character* witnesses establishes a reasonable probability that had it heard Dr. Lawler's *expert* psychiatric opinion its conclusion would have been different. We believe it more likely that the jury's inquiry shows that it was looking for a way to mitigate what defendant had done. Mitigation, however, is irrelevant to defendant's guilt or innocence. At best, Lawler's testimony would have allowed the jury to acquit defendant based on compassion or sympathy for him. Under the law, however, a jury is not permitted to decide a case based on such factors. "A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed." (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) Therefore, we conclude that defendant was not prejudiced by the failure of Dr. Lawler to testify.

■ Defendant's second argument on appeal is that he was denied a fair trial because the trial judge failed to exercise his discretion and give a meaningful answer to the question asked by the jury during its deliberations. Defendant contends that the statement "[t]he court cannot answer your question" clearly illustrates that "the judge was laboring under the erroneous belief that he was without discretion" to answer the jury's question. Defendant also argues that the jury's question clearly evidenced its confusion as to defendant's burden of proof and that referring the jurors to their instructions was "meaningless" because the instructions undoubtedly "had already been examined and explained to them." Defendant asserts that "[h]ad the instructions been adequate, there would have been no confusion and hence no question."

According to the record, after the question from the jury was received, the trial judge called defense counsel and the prosecutor into chambers and asked for their comments on possible responses. Defense counsel asked that the judge respond to the question by telling the jury that "character witnesses are not admissible in this type of offense." He stated that throughout the trial whenever he asked a witness about whether defendant got along with his neighbors or others in the community, the judge sustained the prosecutor's objections. Therefore, he argued that the court would not allow character witnesses to testify. He contended that the jurors' question indicated that they feared that defendant did not present character witnesses be-

cause he could not get any such witnesses and "that's not the truth at all."

The prosecutor maintained that the judge's prior rulings were proper and that the State would rely upon them. He asserted that defendant had no character witnesses because he listed none in his answer to discovery. Additionally, he argued that when defense counsel asked questions to witnesses concerning character and reputation, he did not lay the proper foundation.

The trial judge concluded that the defendant did not call character witnesses because he did not list or even suggest them in his answer to discovery. The judge determined that the jury was asking "why the defense presented certain evidence, and did not present other evidence." Therefore, the judge concluded that he could not directly answer the jurors' question. The judge decided to recommend to the jurors that they review the instructions. He stated that "[t]he instructions will tell the jury that the burden of proof is on the State, and the *** defendant is not required to prove his innocence."

A trial judge has discretion to answer or refrain from answering a question from the jury and his decision, whatever it may be, will not be disturbed absent an abuse of that discretion. (*People v. Reid* (1990), 136 Ill. 2d 27, 38-39, 554 N.E.2d 174, 179.) However, a judge has a duty to give additional instruction " 'where clarification is requested, the original instructions are incomplete, and the jurors are manifestly confused.' " (*Reid*, 136 Ill. 2d at 39, 554 N.E.2d at 179, quoting *People v. Gathings* (1981), 99 Ill. App. 3d 1135, 1138, 425 N.E.2d 1313, 1316.) Additionally, " '[w]here a jury has raised an explicit question on a point of law arising from the facts over which there is doubt or confusion, the court should attempt to clarify the question in the minds of the jury members' " (*Reid*, 136 Ill. 2d at 39, 554 N.E.2d at 179, quoting *People v. Jackson* (1980), 89 Ill. App. 3d 461, 479), even if the proper instructions were originally given to the jury. *Reid*, 136 Ill. 2d at 39, 554 N.E.2d at 179; *People v. Morris* (1980), 81 Ill. App. 3d 288, 291, 401 N.E.2d 284, 286.

On the other hand, a judge properly exercises his discretion and refuses to answer a jury's question where the given instructions "sufficiently explain the relevant law" (*People v. Shannon* (1990), 206 Ill. App. 3d 310, 317, 564 N.E.2d 198, 203) in "clear and in common language which the jury could understand." (*People v. Petty* (1987), 160 Ill. App. 3d 207, 213, 513 N.E.2d 486, 490.) Obviously, the judge is not required to answer a question from the jury if it involves "ramifications the judge could not properly go into" (*People v. Walker* (1975), 33 Ill. App. 3d 681, 686, 338 N.E.2d 449, 453) or if the answer would

not be useful to the jury. (*People v. Jones* (1976), 40 Ill. App. 3d 771, 774, 353 N.E.2d 79, 82; *Walker*, 33 Ill. App. 3d at 686, 338 N.E.2d at 453.) It is reversible error, however, if a trial judge refuses to answer a jury question "in the erroneous belief that [he] has no discretion" to respond to the inquiry. *People v. Queen* (1974), 56 Ill. 2d 560, 565, 310 N.E.2d 166, 169.

We first address defendant's contention that the second sentence in the trial judge's response to the jury's question shows that "the judge was laboring under the erroneous belief" that he did not have the authority to answer the jury's question. The exchange between the trial judge and both counsel when determining how to respond to the jury's question clearly illustrates that the trial judge understood that he had the discretion to answer or refrain from answering the jury's question. The judge determined, in effect, that the jury was asking about defense trial strategy and properly concluded that he could not answer the jury's question. He determined that it would be best to focus the jury's attention upon the instructions which would inform the jury that the State bears the burden of proving defendant's guilt and that the defendant does not have to prove his innocence. A more specific response to the jury's question would not have assisted the jury in its deliberations and, in fact, would have involved "ramifications the judge could not properly go into." (*Walker*, 33 Ill. App. 3d at 686, 338 N.E.2d at 453.) Therefore, the judge's response was the product of a valid exercise of discretion and not based upon the mistaken belief that he had no discretion.

Defendant also asserts that the jury's question clearly evidenced its misunderstanding of defendant's burden in a criminal case. Therefore, the trial judge's response that the jury should review the instructions was "meaningless" because the instructions were obviously inadequate; otherwise, "there would have been no confusion and hence no question." If we understand defendant's argument correctly, if the instructions were adequate, then the jury would not have been confused; however, since the jury was confused, the instructions must have been inadequate. At the instruction conference, however, defense counsel did not object to the instructions. The jury received Illinois Pattern Jury Instructions, Criminal, No. 2.03 (2d ed. 1981) on the burden of proof and the presumption of innocence. The instructions fully informed the jurors of the relevant law and were written in clear and in common language that they could understand. Numerous cases have held that a response to a jury question which refers the jurors back to clear instructions is a valid exercise of discretion. (*Reid*, 136 Ill. 2d at 39-40, 554 N.E.2d at 179-80; *People v. Salazar* (1991), 211

Ill. App. 3d 899, 912-13, 570 N.E.2d 802, 811; *People v. Palmer* (1982), 111 Ill. App. 3d 800, 806-07, 444 N.E.2d 678, 683; *People v. Tostado* (1981), 92 Ill. App. 3d 837, 839, 416 N.E.2d 353, 355; *People v. Charles* (1977), 46 Ill. App. 3d 485, 488-89, 360 N.E.2d 1214, 1216-17; *Walker*, 33 Ill. App. 3d at 685-86, 338 N.E.2d at 452-53.) Under the circumstances of this case, we hold that the trial judge did not abuse his discretion by refusing to answer the jury's question and instead referring it to the jury instructions.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

O'CONNOR and MANNING, JJ., concur.