THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR BABIARZ, Defendant-Appellant.

First District (5th Division)   No. 1—91—3173

Opinion filed February 17, 1995.

Michael J. Pelletier and Karen Daniel, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Michele I. Lavin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

## BACKGROUND

The defendant-appellant Victor Babiarz was charged with the

February 12, 1989, murder of Miguel Panigua. On July 25, 1991, a jury found the defendant guilty and the circuit court entered judgment on that verdict. The court subsequently sentenced the defendant to a 40-year term of imprisonment. For the reasons set forth below, we affirm both the defendant's conviction and his sentence.

FACTS

The defendant filed a motion *in limine* to exclude from evidence a 9 millimeter handgun recovered from his residence at the time of his arrest. The State conceded that the recovered handgun could not have been used in this offense. The court subsequently denied the defendant's motion.

Trial commenced on July 23, 1991. John Alvarado testified for the State that he was inside his apartment at 2626 W. 23rd Street in Chicago at about 11 p.m. on February 12, 1989, when he heard approximately five gunshots on 23rd Street, just outside of his residence. He stated that the first report sounded softer than those that followed, as if from a smaller firearm. Alvarado went outside and found the victim, Miguel Panigua, lying on the sidewalk before 2620 W. 23rd Street. Panigua was alive but had multiple gunshot wounds.

Maria Ramirez testified next and stated that she lived at 2611 W. 23rd Street on February 12, 1989, and also heard five or six gunshots at approximately 11 p.m. She immediately went to a window and saw two males, whom she could not identify, walking eastbound on the north side of 23rd Street at a fast pace. They proceeded past her apartment and then ran northbound through a gangway at 2606 W. 23rd Street.

Boyce Flowers also testified, stating that he, the defendant, Alexander Sanchez, and Francisco Sanchez, Alexander's brother, all belonged to a street gang called the Cullerton Deuces. At approximately 10 p.m. on February 12, 1989, Flowers sat in a car with Francisco Sanchez and others. Francisco exited that car and spoke briefly with his brother Alexander and the defendant; Alexander and the defendant then walked away.

Approximately one hour later, the defendant and Alexander Sanchez returned to the car. Both appeared "excited, nervous." The defendant stated that "[w]e just shot a Disciple on 23rd Street" and "we lit them up ugly." Alexander Sanchez stated "[w]e got a D, a Disciple." Either the defendant or Alexander then said "we did that for you, Francisco." Flowers stated that the Satan Disciples were the major rival street gang of the Cullerton Deuces and that in July of 1988 Francisco Sanchez had been shot, presumably by a Satan Disciple.

Chicago police detective John Summerville testified that he developed information that the defendant had been one of the assailants in this case and therefore went to his apartment on March 3, 1989, to arrest him. Before Summerville arrived at the defendant's apartment, he discovered an outstanding arrest warrant for him but did not know the offense upon which that warrant was based.

The defendant's grandfather admitted Summerville and other detectives into the apartment, where they discovered the defendant hiding in a closet. Summerville stated that the grandfather gave them a 9 millimeter handgun which he said had been within a rolled carpet outside, on a rear porch. Summerville identified this handgun in court but testified that it could not have been used to shoot the victim.

Summerville and Detective Ricardo Abreu interviewed the defendant at the Area 4 detective division office on the early morning of March 3, 1989. The defendant confessed that on February 12, 1989, he and Alexander Sanchez shot the victim. He stated that he and Alexander decided to shoot a member of the Satan Disciples and that both were armed with handguns, he with a small semiautomatic and Alexander with a larger handgun. They encountered the victim on 23rd Street and, after an exchange of gang hand signals, identified him as a Satan Disciple.

According to Summerville's testimony, the defendant stated that he and Alexander Sanchez initially proceeded to rob the victim at gunpoint but, after the victim again flashed Satan Disciple hand signs, Alexander shot him several times. The defendant admitted firing his gun only once, deliberately missing the victim. They then fled, hid their guns in an alley, and rejoined Boyce Flowers, Francisco Sanchez, and the others in the car.

Assistant State's Attorney Kay Hanlon testified that she interviewed the defendant later in the morning of March 3, 1989, and that he made essentially the same confession that he made to Summerville and Abreu. However, in this later confession the defendant clarified and changed his earlier statement. Alexander Sanchez had telephoned him, requesting that he come to the neighborhood of 21st Street and Washtenaw. The defendant did so and brought along his .25-caliber semiautomatic.

He met Alexander Sanchez and they agreed to shoot a Satan Disciple in retaliation for the July 1988 shooting of Francisco Sanchez, Alexander's brother, for which they believed the Satan Disciples to be responsible. The defendant admitted that he and Alexander neither intended nor attempted to rob the victim. The defendant stated that Alexander shot the victim five or six times but that he shot him only once.

The State presented the following testimony relating to the physical evidence in this case. Officer James Shadur of the Chicago police department testified that he responded to 2620 W. 23rd Street immediately after the shooting and recovered one cartridge casing 20 to 25 feet from where the victim's body had been lying.

Dr. Shaku Teas testified that on February 13, 1989, she worked as a pathologist for the Cook County medical examiner's office and examined the victim's body, determining that he died as a result of six gunshot wounds. She recovered four bullets from the body which were sent to the Chicago police.

Chicago police officer Richard Chenow examined the four bullets which Dr. Teas recovered and determined that they were either .38 or .357 magnum caliber (.38 and .357 magnum cartridges contain identical bullets) and that they had been fired from the same revolver. Chenow also examined the cartridge casing which Officer Shadur recovered and determined it to be from a .25-caliber semiautomatic. He stated that firing a .25-caliber handgun would produce a much quieter report than firing either a .38- or .357-caliber handgun. Chenow identified the 9 millimeter handgun recovered from the defendant's apartment and, like Detective Summerville, stated that it could not have been the murder weapon because, due to the difference in caliber, it could not have fired the recovered bullets.

The defendant testified on his own behalf, denying that he shot the victim, that he saw Alexander Sanchez on February 12, 1989, that he possessed a .25-caliber handgun, or that he belonged to the Cullerton Deuces street gang. He stated that on February 12, 1989, he and two friends, Rubin Sanchez and Raudel Sanchez, attended a "Teen Night" at a nightclub. They arrived at about 7 p.m. and left at around 10:30. After they left, they walked to Rubin Sanchez' residence. On their way to Rubin's residence, they saw Boyce Flowers, Francisco Sanchez and two others who were sitting in a car, drinking. They spoke to that group briefly and then continued to Rubin's apartment, where the defendant spent the night.

Raudel Sanchez testified for the defense and corroborated the alibi to which the defendant testified. On cross-examination, the assistant State's Attorney asked whether Raudel had been arrested for burglary. The defendant immediately made an objection to that question which the court sustained. Rubin Sanchez also testified, corroborating the alibi to which the defendant and Raudel Sanchez testified.

In rebuttal, the State called Edward Hamilton, who worked as a paramedic at the Cook County jail on March 4, 1989. On that date, he performed a physical examination of the defendant, which re-

vealed no signs of injury, and prepared a written intake report recording the results of that examination. During his testimony, Hamilton read from the report he had prepared because he could not recollect his examination of the defendant. Hamilton was never asked, and thus never testified, whether that report was accurate; nor did he testify that by looking at the report his memory was refreshed.

On July 25, 1991, the jury found the defendant guilty of first degree murder and the court entered judgment on that verdict. On August 26, 1991, the court held a sentencing hearing, indicating that it had read the presentence investigation, which indicated that the defendant was 17 at the time of the offense and had no reported criminal history, that it considered the statutory factors in aggravation and mitigation, and that it considered counsel's arguments. The court then sentenced the defendant to a 40-year term of imprisonment.

On appeal, the defendant raises the following issues: (1) that the trial court erred in admitting the 9 millimeter handgun recovered from the defendant's apartment because that handgun could not have been the murder weapon; (2) that Detective Summerville's testimony that the defendant was wanted on an unrelated warrant at the time of his arrest impermissibly alluded to the defendant's prior criminal conduct; (3) that neither the intake report nor the testimony of Edward Hamilton should have been admitted because Hamilton failed to vouch for the report's accuracy; (4) that the State's question to Raudel Sanchez regarding a burglary arrest was an improper attempt at impeachment; (5) that the cumulative effect of the alleged trial errors deprived him of a fair trial; (6) that his trial counsel provided ineffective assistance by failing to preserve issues two through four above for appellate review; and (7) that the circuit court abused its discretion at sentencing by failing to consider his potential for rehabilitation.

## OPINION

### THE 9 MILLIMETER HANDGUN

The defendant first argues that the circuit court erred by denying his motion *in limine* and admitting into evidence the 9 millimeter handgun recovered from his apartment the morning of his arrest. He maintains that since the State's own evidence showed that that handgun could not have been used in the shooting, it was error to admit it into evidence at trial or to permit the State's witnesses to testify to its recovery.

Evidence is relevant if it has any tendency to make the existence of any material fact more or less probable than it would be without the evidence. (*People v. Boclair* (1989), 129 Ill. 2d 458, 477, 544 N.E.2d 715, 723; M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 401.1, at 129 (6th ed. 1994).) " 'A trial court may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature.' " (*People v. Enis* (1990), 139 Ill. 2d 264, 281, 564 N.E.2d 1155, 1161, quoting *People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696, 702.) A determination of whether evidence is sufficiently relevant to permit its admission will not be disturbed absent a showing that the circuit court abused its discretion. See *People v. Cloutier* (1993), 156 Ill. 2d 483, 501, 622 N.E.2d 774, 784; *People v. Ward*, 101 Ill. 2d at 455-56, 463 N.E.2d at 702.

The general rule is that weapons are admissible if connected to both the defendant and the crime. (*People v. Fierer* (1988), 124 Ill. 2d 176, 194, 529 N.E.2d 972, 979; *People v. Tribbett* (1968), 41 Ill. 2d 267, 270, 242 N.E.2d 249, 251.) In *People v. Lee* (1993), 242 Ill. App. 3d 40, 610 N.E.2d 727, we discussed the admissibility of weapons:

"Not every weapon connected with defendant is admissible, but every weapon sufficiently connected with the crime is admissible. In some cases, such as this one where defendant was positively identified as the perpetrator and the weapon was identified as the one used, proof connecting the weapon with the crime may also be sufficient to connect defendant with the weapon. Another example would be where a weapon is dropped at the scene of the crime; that weapon would be admissible even if there were no other evidence to connect it to defendant. In contrast, a weapon clearly connected to defendant (*e.g.*, found later on defendant's person) would not be admissible if there were no evidence to connect it with the crime." 242 Ill. App. 3d at 42-43, 610 N.E.2d at 729.

Such a connection between the weapon and the crime as referred to in *People v. Lee* exists where the weapon is "suitable" for the commission of the offense. (*People v. Magby* (1967), 37 Ill. 2d 197, 202, 226 N.E.2d 33, 36; *People v. Jackson* (1990), 195 Ill. App. 3d 104, 112, 551 N.E.2d 1025, 1029.) The weapon need only be "suitable" for the crime; it need not be proven to have been the actual weapon used. (*People v. Free* (1983), 94 Ill. 2d 378, 415-16, 447 N.E.2d 218, 236; *People v. Lee*, 242 Ill. App. 3d at 43, 610 N.E.2d at 729.) "Thus, where the defendant on arrest possesses a weapon similar to the weapon described by a witness, the recovered weapon may be admissible even though the witness cannot identify it as the perpetrator's weapon, thereby permitting a jury to infer from the defendant's possession of a suit-

able weapon that the weapon recovered was the one used to commit the offense." *People v. Jackson*, 195 Ill. App. 3d at 112, 551 N.E.2d at 1029; accord *People v. Kincy* (1982), 106 Ill. App. 3d 250, 258, 435 N.E.2d 831, 837.

However, a firearm is not admissible where evidence, such as eyewitness testimony or a ballistics test, establishes that the recovered firearm, even if sufficiently connected to the defendant, was not used in the commission of the offense. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 401.4, at 139-41 (6th ed. 1994); *People v. Jackson*, 195 Ill. App. 3d at 113, 551 N.E.2d at 1030 (eyewitness testimony specifically excluded the recovered handgun as that used in a shooting); *People v. Suerth* (1981), 97 Ill. App. 3d 1005, 1013, 423 N.E.2d 1185, 1193 (the State's knowledge that the victim died from a .44-caliber gunshot wound precluded admissibility of a shotgun); *People v. Wade* (1977), 51 Ill. App. 3d 721, 729-30, 366 N.E.2d 528, 534 (stipulated ballistics evidence showing that a .357-caliber handgun recovered from the defendant could not have been the murder weapon).

■ Based on the testimony of Detective Summerville and Officer Chenow, we find that it was error for the trial court to admit the 9 millimeter handgun recovered from the defendant's residence into evidence. Both Summerville and Chenow testified that the recovered handgun could not have been the murder weapon because it was of a different caliber than the bullets recovered from the victim's body. Those bullets were determined to be .38/.357 caliber. Manifestly, that handgun was in no way "suitable" for this offense because it could not have fired the bullets recovered from the victim's body. See *People v. Suerth*, 97 Ill. App. 3d at 1013, 423 N.E.2d at 1193; *People v. Wade*, 51 Ill. App. 3d at 729-30, 366 N.E.2d at 534.

Beyond this, the State demonstrated only a negligible connection between that handgun and the defendant. It was recovered neither from his person nor from an area under his exclusive control. There was no testimony that he had ever possessed that handgun. His grandfather retrieved it from inside a rolled carpet on the rear porch of the defendant's apartment building to which many people other than the defendant, even trespassers, could have had access. Accordingly, that 9 millimeter handgun had little if any probity and its admission could only have prejudiced the defendant.

However, notwithstanding the error in admitting the handgun, we need not intervene because we find that error harmless. A trial error will be deemed harmless where the evidence supporting the defendant's conviction is so overwhelming that the defendant would have been convicted even if the error had not occurred. *People v.*

*Laliberte* (1993), 246 Ill. App. 3d 159, 173, 615 N.E.2d 813, 823; *People v. Moreno* (1992), 238 Ill. App. 3d 626, 637, 606 N.E.2d 514, 522.

Here, the defendant made three separate confessions: to Boyce Flowers, to Detectives Summerville and Abreu, and to Assistant State's Attorney Kay Hanlon. Those confessions were corroborated by both physical and testimonial evidence. Consistent with the defendant's confessions, Officer Shadur recovered one .25-caliber cartridge casing 20 to 25 feet from the victim's body; Dr. Teas observed six gunshot wounds to, and recovered four bullets from, the victim's body; Officer Chenow identified the recovered bullets as .38/.357 caliber, fired from the same revolver; John Alvarado heard approximately five gunshots, the first softer than those that followed; Officer Chenow testified that the report from a .25-caliber handgun would be much quieter than that from a .38 or .357 magnum handgun; and Maria Ramirez saw two males on 23rd Street, fleeing the scene of the murder.

Given the defendant's confessions, made to four different persons, including an assistant State's Attorney, and the detailed corroboration enumerated above, we cannot say that the outcome of the defendant's trial would have differed if the 9 millimeter handgun had not been admitted. We additionally mention that any impermissible inferences which the jury could have drawn from that improperly admitted handgun were significantly reduced by the fact that the gun was not submitted to the jury during its deliberations.

ISSUES TWO THROUGH FOUR

The defendant concedes that he has waived appellate review of issues two through four: issue two, by failing to contemporaneously object; issue three, by failing either to contemporaneously object or to include that issue in his post-trial motion; and issue four, also by failure to include it in his post-trial motion.[1] (See *People v. Enoch* (1988), 122 Ill. 2d 176, 185-90, 522 N.E.2d 1124, 1129-31; *People v. Alcazar* (1988), 173 Ill. App. 3d 344, 354, 527 N.E.2d 325, 331.) However, he urges that we may yet review these alleged errors under the plain error doctrine. See 134 Ill. 2d R. 615(a).

---

[1] With respect to issue four, the attempted impeachment of Raudel Sanchez by asking him about a prior burglary arrest, the fact that the circuit court sustained the defendant's contemporaneous objection to that question largely dissipated any harmful impact. (See *People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200, 1205-06; *People v. Griffin* (1982), 113 Ill. App. 3d 184, 190, 446 N.E.2d 1175, 1180.) As noted above, the defendant failed to raise any residual error from that attempted impeachment in his post-trial motion.

"The plain error doctrine provides that a court of review may notice waived errors if either the evidence is closely balanced or the error is fundamental and of such magnitude that the accused was denied a fair trial and remedying the error is necessary to preserve the integrity of the judicial process." *People v. Gonzalez* (1992), 238 Ill. App. 3d 303, 314, 606 N.E.2d 304, 312; accord *People v. Shields* (1991), 143 Ill. 2d 435, 446, 575 N.E.2d 538, 543; *People v. Herrett* (1990), 137 Ill. 2d 195, 209-10, 561 N.E.2d 1, 7-8.

■ We find that the plain error doctrine does not compel review of the otherwise waived issues two through four. As discussed above, the evidence in this case was not closely balanced. To the contrary, the defendant's confessions and the corroborating testimonial and physical evidence overwhelmingly proved his guilt. Beyond this, we cannot say that any of these alleged errors could have been of such a magnitude to deprive him of a fair trial so that "remedying [them would be] necessary to preserve the integrity of the judicial process." *People v. Gonzalez*, 238 Ill. App. 3d at 314, 606 N.E.2d at 312.

CUMULATIVE IMPACT OF THE ALLEGED ERRORS

The defendant next contends that the cumulative effect of the asserted trial errors deprived him of a fair trial and therefore requires reversal. Individual trial errors which, when considered separately, would not warrant reversal may have the cumulative effect of denying the defendant a fair trial. See *People v. Speight* (1992), 153 Ill. 2d 365, 376-77, 606 N.E.2d 1174, 1178-79; *People v. Whitlow* (1982), 89 Ill. 2d 322, 341, 433 N.E.2d 629, 638.

■ However, as discussed above, the defendant has not shown any such cumulative error because he has waived review of issues two through four and because those issues are not otherwise cognizable as plain error. Even if we had reviewed issues two through four and found error, we cannot say that any such cumulative error would have affected the jury's verdict given the otherwise overwhelming evidence of the defendant's guilt.

EFFECTIVE ASSISTANCE OF COUNSEL

The defendant next maintains that his trial counsel provided ineffective assistance by failing to properly preserve issues two through four for appeal, either by failing to contemporaneously object or by failing to raise those issues in his post-trial motion.

To establish a claim of ineffective assistance of counsel a defendant must prove, first, that his counsel's representation fell below an objective standard of competence and, second, that, but for that failure, the outcome of his trial or sentencing would have differed.

(*People v. Hall* (1993), 157 Ill. 2d 324, 337, 626 N.E.2d 131, 136; see also *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, *adopted in People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) To establish that counsel's trial error affected the outcome, the defendant must prove not simply a possibility of prejudice, but that the claimed error worked to his actual and substantial disadvantage. (*People v. Owens* (1989), 129 Ill. 2d 303, 318, 544 N.E.2d 276, 282.) He must show that his "counsel's deficient performance was 'sufficient to undermine confidence in the outcome.' " *People v. McPhee* (1993), 256 Ill. App. 3d 102, 106, 628 N.E.2d 523, 526, quoting *People v. Patten* (1992), 240 Ill. App. 3d 407, 413, 608 N.E.2d 351, 355.

A court may proceed directly to the prejudice prong of the test for ineffective assistance and, if the requisite prejudice has not been shown, may decide the issue without analyzing the effectiveness of representation. (*People v. Enoch* (1991), 146 Ill. 2d 44, 56-57, 585 N.E.2d 115, 121; *People v. Edgeston* (1993), 243 Ill. App. 3d 1, 12, 611 N.E.2d 49, 57.) Courts, moreover, must entertain a " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *People v. Albanese*, 104 Ill. 2d at 526, 473 N.E.2d at 1255, quoting *Strickland v. Washington*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

■ In this case, even if counsel had been ineffective in failing to preserve the alleged errors for review, the defendant's confessions, supported by corroborating testimonial and physical evidence, overwhelmingly support a guilty verdict. Thus, even if issues two through four had been preserved for our review, and even if we had found error, such error would not have compelled or warranted reversal. See *People v. Owens*, 129 Ill. 2d at 318, 544 N.E.2d at 276; *People v. McPhee*, 256 Ill. App. 3d at 106, 628 N.E.2d at 526.

SENTENCING

The defendant finally argues that the trial court abused its discretion in sentencing him because it failed to consider his potential for rehabilitation. He points to his age at the time of the offense, the absence of any criminal history, and his allegedly less active role in the murder.

Since trial courts can best weigh the factors relevant to sentencing (*People v. Young* (1987), 152 Ill. App. 3d 361, 365, 504 N.E.2d 115, 117-18), reviewing courts will not disturb a sentence absent a showing that the circuit court abused its discretion. (*People v. Wilson* (1991), 143 Ill. 2d 236, 250, 572 N.E.2d 937, 944.) A trial court need not articulate the process by which it determines the appropriateness of a given sentence. (*People v. Jarrell* (1993), 248 Ill. App. 3d 1043,

1051, 618 N.E.2d 944, 949.) It need not expressly indicate its consideration of mitigating factors and, absent evidence to the contrary, is presumed to have considered mitigating factors brought before it. *People v. Tirado* (1993), 254 Ill. App. 3d 497, 511, 626 N.E.2d 1114, 1125.

Where the sentencing court examines a presentence report, it is presumed that the court considered the defendant's potential for rehabilitation. (*People v. Powell* (1987), 159 Ill. App. 3d 1005, 1011, 512 N.E.2d 1364, 1368; *People v. Shumate* (1981), 94 Ill. App. 3d 478, 485, 419 N.E.2d 36, 42.) The court, however, need not accord greater weight to defendant's potential for rehabilitation than to the seriousness of the crime. *People v. Boclair* (1992), 225 Ill. App. 3d 331, 335-36, 587 N.E.2d 1221, 1224.

■ We cannot say that the circuit court abused its discretion in sentencing the defendant. The court explicitly stated that it read the presentence investigation and we must therefore presume that the court considered the defendant's potential for rehabilitation in determining his sentence. (See *People v. Powell*, 159 Ill. App. 3d at 1011, 512 N.E.2d at 1368; *People v. Shumate*, 94 Ill. App. 3d at 485, 419 N.E.2d at 42.) The defendant directs us to no evidence to rebut that presumption.

Additionally, the circuit court need not have accorded greater weight to the defendant's potential for rehabilitation than to the seriousness of this murder. (*People v. Boclair*, 225 Ill. App. 3d at 335-36, 587 N.E.2d at 1224.) The circuit court could have readily found that the random, retaliatory nature of this gang murder outweighed any potential for rehabilitation as indicated by the defendant's age, his lack of criminal history, or any such less active role in the crime.

Beyond this, we note that the 40-year term which the defendant received was less than the 45-year term which the State sought and fell into the middle of the 20- to 60-year range provided for first degree murder. See Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(a).

CONCLUSION

For the reasons discussed above, both the defendant's conviction and his sentence are affirmed.

Affirmed.

COUSINS, P.J., and O'BRIEN, J., concur.