# Illinois Official Reports

## Appellate Court

*People v. Kraybill*, 2014 IL App (1st) 120232

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID KRAYBILL, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-12-0232 |
| Filed | June 30, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court upheld defendant's conviction for first-degree murder after rejecting his argument that the cumulative effect of the trial court's erroneous evidentiary rulings required the reversal of his conviction, since evidence of the victim's alleged criminal activities was properly excluded on the grounds that it was speculative and inadmissible, especially in the absence of any significant connection to the murder, a silencer discovered in defendant's home was properly admitted based on the evidence that it was threaded to fit a handgun that defendant also owned and was the type of weapon used to kill the victim, the trial court did not err in finding that defendant's recorded interview with a detective was inadmissible, and although photographs of collector coins found in defendant's home were improperly admitted in evidence, that single error did not warrant reversal in view of the overwhelming evidence of defendant's guilt. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-1044001; the Hon. Garritt E. Howard, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Kathleen T. Zellner & Associates, of Downers Grove (Douglas H. Johnson, of counsel), for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary Needham, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE MASON delivered the judgment of the court with opinion. Presiding Justice Hyman and Justice Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant David Kraybill appeals his conviction for the first-degree murder of Joel Cacharelis following a jury trial.[1] Kraybill raises the following evidentiary rulings as a basis for the reversal of his conviction: (1) preclusion of evidence of Cacharelis's criminal activities; (2) preclusion of evidence relating to the destruction of a detective's interview notes; (3) preclusion of a tape recorded interview between Kraybill and a detective; and (4) admission of photographs of collector coins and evidence of a .22-caliber silencer discovered in his house. Kraybill claims that the cumulative effect of the trial court's erroneous evidentiary rulings warrants a reversal of his conviction. We disagree and affirm.

¶ 2                                 BACKGROUND

Cacharelis was murdered in Winnetka, Illinois, on February 24, 2003. Cacharelis and Kraybill were childhood friends who kept in touch after Kraybill moved to Madison, Wisconsin. Kraybill visited Cacharelis at his home in Winnetka on February 24 and left with him in his car later that evening. Cacharelis's body was discovered on a remote road in Winnetka shortly after 11 p.m. Approximately one year later, a grand jury indicted Kraybill on one count of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2002)) and one count of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2002)).

¶ 3                             A. Motions *in Limine*

¶ 4    Prior to trial, Kraybill filed a motion *in limine* to exclude evidence relating to a .22-caliber silencer recovered from his house following a search, arguing that the silencer was irrelevant and the probative value, if any, was substantially outweighed by the danger of unfair prejudice. During the hearing on the motion, Kraybill acknowledged that he was

---

[1]This appeal relates to Kraybill's second jury trial. Following the appeal of his first jury trial where he was convicted of the same charges, this court reversed and remanded the case for another trial finding that testimony addressing Kraybill's silence during police questioning and the State's arguments relating to that silence denied him a fair trial. *People v. Kraybill*, No. 1-06-0872 (2008) (unpublished order under Supreme Court Rule 23).

connected to the silencer because it was recovered from his house, but argued that the State failed to present evidence that a silencer was used in the murder. The State responded that the silencer was relevant because it was purchased in the same transaction as Kraybill's .22-caliber Beretta handgun, the type of weapon used to murder Cacharelis, and no residents who lived in the vicinity of the crime scene heard approximately 11 gunshots or called 911, rendering it likely that a silencer was used to commit the murder. After hearing arguments, the trial court denied Kraybill's motion *in limine* finding that the silencer was relevant and the probative value outweighed any prejudicial impact.

¶ 5    During trial, Kraybill filed another motion *in limine* requesting the court to bar from evidence reference to and photographs of collector coins found in his home. Kraybill argued the evidence relating to the coins was irrelevant, unfairly prejudicial and would invite speculation regarding a connection between certain unique coins recovered from Cacharelis's vehicle and the coins discovered in Kraybill's house. Kraybill further argued that if the trial court allowed the State to reference the photographs of the collector coins, then he should be permitted to introduce evidence relating to pending burglary charges against Cacharelis and other burglary-related facts.

¶ 6    The State responded that the collector coins were relevant not to suggest that Kraybill was part of a burglary ring, but to establish the reasonable inference that Kraybill may have placed the coins in Cacharelis's vehicle. The trial court denied Kraybill's motion *in limine*, finding that: (1) unique coins were found underneath the floor mat on the passenger's side of Cacharelis's vehicle and (2) Kraybill's fingerprint was found on that side of Cacharelis's vehicle indicating that in all likelihood he was sitting in the passenger seat. In rendering its decision, the trial court specifically stated that it would have been inclined to grant Kraybill's motion but for the fact that the defense first argued the relevancy of the coins in Cacharelis's vehicle. The trial court also stated that its ruling did not render relevant evidence relating to Cacharelis's pending burglary charges.

¶ 7    Before trial, the State filed a motion *in limine* to bar Kraybill from mentioning that Cacharelis had burglary charges pending at the time of his death and that a ring discovered in his vehicle was stolen. At the hearing, Kraybill argued that Cacharelis's pending charges were relevant because they suggested that Cacharelis's involvement in illegal conduct, and not Kraybill's actions, caused his death. The trial court granted the State's motion but ruled that if Kraybill could produce new evidence linking the victim's alleged criminal activities to his murder, the court would revisit the issue.

¶ 8    In the same motion *in limine*, the State sought to preclude Kraybill from discussing a tape-recorded conversation between Kraybill and Sergeant James Christensen of the Winnetka police department that occurred on February 21, 2004. The State argued the conversation was hearsay unless: (1) the State questioned Christensen about that conversation during his direct examination or (2) Kraybill decided to testify. Kraybill responded that Christensen recorded the conversation with a concealed recording device that was unknown to Kraybill and the recorded conversation was not hearsay. Kraybill claimed that the recorded conversation addressed statements Kraybill allegedly made to Christensen in 2003 and explained the interaction between the two individuals during the 2003 interviews. The trial court granted the State's motion but noted that the conversation could be admitted if Kraybill took the stand and denied making the earlier statements.

¶ 9                                    B. Trial Evidence

¶ 10         Cacharelis lived with his mother, Charlotte, in Winnetka. Charlotte had known Kraybill for most of his life because he grew up close by and was her son's childhood friend. Around 1990, Kraybill moved to Madison, Wisconsin, but remained in contact with Cacharelis and visited him approximately every six to eight weeks.

¶ 11         On February 24, 2003, at approximately 9 p.m., the front door bell rang at the Cacharelis home. Charlotte began walking toward the front door from her bedroom on the second floor. Before she reached the front door, she saw Kraybill coming up the stairs. Kraybill was wearing a red and black puffy winter jacket. Kraybill looked at Charlotte, but he did not say hello or acknowledge her in any way, which was unusual since he had previously always greeted her. After Kraybill reached the top of the stairs, he went toward Cacharelis's bedroom, walking past Charlotte, who was not expecting to see him that night. Cacharelis was home at the time and was in his bedroom.

¶ 12         After about 10 minutes, Charlotte heard Cacharelis and Kraybill walk down the wooden front stairs. Charlotte assumed that they left through the back door because that door was near Cacharelis's vehicle, a Mercury Cougar, which he typically parked at the rear of the house. No one other than Cacharelis had a set of keys to his car.

¶ 13         At approximately 10:30 p.m., Charlotte went to bed. Neither Cacharelis nor Kraybill returned to the house by the time she fell asleep and she did not hear Cacharelis's vehicle return home. At approximately 3 a.m., the police arrived at the house and told her that her son had been killed. Charlotte told the police that Kraybill was at the house earlier and that Cacharelis left the house with him.

¶ 14         On February 22, 2003, Russell Sundsmo, Kraybill's coworker who was interested in buying a vehicle from Kraybill, called Kraybill to arrange a time on Monday, February 24 to view the vehicle. Kraybill told Sundsmo that he would have to come early that day because Kraybill planned to go to Chicago to visit an old friend. Kraybill did not mention the friend's name.

¶ 15         The parties stipulated that at approximately 11:09 p.m. on February 24, 2003, Heidi Lubin was driving northbound on Forestway Drive in Winnetka when she swerved to avoid hitting what she believed to be a body in the road. Forestway Drive is a winding, paved road in a fairly secluded area, although there are some homes nearby. Lubin swerved a second time when she saw a pair of gloves in the road. Lubin did not see anyone else in the area. After she arrived home, Lubin called the Glencoe police department at approximately 11:20 p.m. to report what she had seen.

¶ 16         After receiving Lubin's call, Glencoe police notified the Winnetka police department. Apart from Lubin's call, no one called 911 that night to report hearing gunshots.

¶ 17         Daniel Weber was a detective and evidence technician for the Winnetka police department and was eventually called to investigate the scene. When Weber arrived, he noticed Cacharelis's body on the roadway and saw bullet wounds to the back of his head and wet, pooling blood around his head. Near Cacharelis's body, Weber found seven .22-caliber shell casings, which suggested that the bullets had been fired from a semiautomatic weapon. North of Cacharelis's body, Weber discovered two leather gloves. Folded inside each leather glove was a purple nitrile glove, which is very similar to a latex medical examination glove. The purple gloves appeared to be unworn.

¶ 18    At a nearby garbage can, Weber located three additional shell casings from a .22-caliber handgun, as well as three sets of distinct footwear impressions and four distinct tire impressions that were left on the snow. One set of the footwear impressions was discovered in three areas at the murder scene and had a triangular outsole pattern. In one area, the impressions were made where a vehicle's passenger door would have been located; the impressions formed a small arch-like path to the same nearby garbage can and then returned to the same passenger door. In another area, the footwear impressions went from where the vehicle's passenger door would have been around what would have been the back of the vehicle onto the roadway of Forestway Drive and then the footwear impressions stopped. In the last area, the footwear impressions went from Forestway Drive near where Cacharelis's body was found to the same garbage can merging to the area where the vehicle's passenger door would have been located. This same footwear impression was later discovered on the ground outside the Cacharelis home. Photographs of the triangular footwear impressions were sent to the FBI in an attempt to match the outsoles to a manufacturer in its database, but the results produced no match.

¶ 19    The murder scene investigation also included the area at the nearby garbage can. Inside the garbage can were chicken wings, a barbecue wings container, an East Bank Club food store plastic bag, a Starbucks coffee cup and two napkins. These items were inventoried for potential evidentiary value because there was no snow covering them, while snow covered all the other trash in the garbage can.

¶ 20    Officer Jim Chartier, a forensic specialist with the Village of Lincolnwood police department, arrived at Cacharelis's house on February 25, 2003, at approximately 7 a.m. to investigate the murder. Cacharelis's car was parked in the driveway. He walked around the car and noticed a .22-caliber shell casing melted into the snow on the trunk's lid. He also noticed that the driver's and passenger's door handles were wiped clean in that they did not have road and salt film on them. Chartier, however, discovered partial fingerprint evidence on the upper driver's side door frame, as well as another fingerprint impression on the passenger side door frame above the cleaned handle. Chartier found rings, jewelry, gold coins and a jewelry box underneath the floor mat on the passenger side of the vehicle. He also noticed numerous bullet strikes within the vehicle's center console armrest, including one into the passenger's side of the center console. The path of the bullet strikes within the center console indicated that the bullets came from the direction of the vehicle's front passenger door, which would have been open. Chartier also noticed footwear impressions displaying a predominant triangular impression leading to the front of the house, and the same impression in the back of the house that pointed toward where Cacharelis's vehicle would have been parked earlier.

¶ 21    At the time of the murder, Jennifer Heggesta was Kraybill's live-in girlfriend and they shared a single-family home in Madison, Wisconsin. Kraybill collected guns and kept the guns secure under lock and key in the house.

¶ 22    During the afternoon of February 23, 2003, Heggesta and Kraybill went to a hospital in Madison, Wisconsin, where her mother had just been admitted. Heggesta recalled seeing purple examination gloves in her mother's room that were in open boxes. There was nothing to prevent someone from reaching into the boxes to remove the purple gloves, but Heggesta did not see Kraybill take any gloves.

¶ 23    The next day, Heggesta returned to the hospital and Kraybill remained at home. When she returned home at approximately 9 p.m., Kraybill's vehicle was not in the garage, he was not home and he did not leave a note or a message on the answering machine indicating his whereabouts.

¶ 24    At approximately 10 or 10:30 p.m., Heggesta went to sleep and Kraybill had not returned home. Heggesta woke up at approximately 10 a.m., and Kraybill was in his bedroom sleeping; she did not know what time he returned home.

¶ 25    On February 25, 2003, two messages were left on Kraybill's answering machine while he was still sleeping: one from a friend in Illinois and the other from Kraybill's mother. Heggesta listened to the messages with Kraybill after he woke up. The friend's voice in her message sounded urgent and she indicated that she wanted to talk to Kraybill. Kraybill's mother's message stated that Cacharelis had been killed and that she was going to call Cacharelis's mother to express condolences. According to Heggesta, Kraybill had no reaction to the messages. Kraybill did not tell Heggesta where he had been the night before or what time he got home. Later on February 25, Kraybill took Heggesta's car and a gas can to go get gas for his car because the fuel was so low.

¶ 26    Kraybill regularly smoked Marlboro Reds cigarettes. Kraybill retained the cigarette packaging displaying the bar code or UPC code because Marlboro had a campaign where proofs of purchase could be exchanged for merchandise displaying the Marlboro logo at a discounted price. Kraybill ordered a Chiller System jacket from Marlboro, which consisted of an outer shell and a removable fleece jacket that is worn underneath the outer shell. The jacket was two-toned–black with a red stripe. Heggesta recalled Kraybill wearing the jacket during the winter of 2001 and 2002, but did not see him wearing the jacket after February 24, 2003. Heggesta also saw Kraybill previously wearing a pair of leather gloves, but did not see him wearing the gloves after February 24, 2003. The leather gloves recovered at the murder scene were similar to the leather gloves she had previously seen Kraybill wearing, but looked more used. Heggesta, however, had not seen the leather gloves that Kraybill owned for a few years prior to the murder.

¶ 27    Shortly after the murder, police obtained a warrant to search Kraybill's home. On February 28, 2003, Lieutenant Dave Macaluso, an evidence technician for the Lincolnwood police department, assisted with the search of Kraybill's house. During the search, Macaluso discovered in cardboard boxes in the basement an owner's manual for a Beretta pistol, which listed a .22-caliber model 87 among several other models. The Beretta handgun was not located during the search, but accessories associated with a .22-caliber handgun were recovered, including a screw-on .22-caliber sound suppresser, which muffles or suppresses the sound of a fired weapon. Also recovered was a receipt dated April 21, 1999, which showed that both a Beretta model 87 weapon and suppressor were purchased by Kraybill for $500 each.

¶ 28    Over 3,600 rounds of .22-caliber ammunition were discovered mainly in the basement in and around a gun safe and approximately 350 rounds were located in Kraybill's bedroom. Remington, CCI and Fiocchi manufactured some of the bullets recovered from Kraybill's house. A search of Kraybill's house also uncovered collector coins, which were photographed, but not inventoried.

¶ 29      The parties stipulated to Kraybill's purchase of a semiautomatic Beretta model 87 .22-caliber handgun and a .22-caliber sound silencer and that the handgun was threaded to accept the sound silencer.

¶ 30      Chris Luckie, an expert in firearm and tool mark examinations, examined the evidence relating to Cacharelis's death that included the 12 shell casings recovered during the investigation. Based on his examination, Luckie determined that the recovered shell casings were discharged from a single .22-caliber weapon. Luckie identified Remington, CCI and Fiocchi as manufacturers of the shell casings. Luckie also examined 10 bullets that were recovered and determined that they were all discharged from a .22-caliber weapon. Luckie was unable to determine whether a single weapon discharged all of the bullets because they had insufficient markings for identification purposes. Luckie determined that a Beretta model 87 was one of six manufacturers out of thousands capable of discharging the recovered bullets.

¶ 31      According to Luckie, if a Berreta model 87 was properly threaded, a silencer may be used with that type of weapon. Luckie, however, did not examine the silencer that was recovered from Kraybill's house because he needed the actual murder weapon in order to determine whether Kraybill's silencer was used to discharge the recovered bullets. Luckie did not think that conducting a controlled test where a gun, any gun, would discharge a bullet with and without use of the recovered silencer would provide very useful information.

¶ 32      William Bodziak specializes in questioned-document examination, footwear-impression evidence and tire-impression evidence. Bodziak examined photographs of the footwear impressions discovered at the murder scene and at Cacharelis's house. He concluded that the same shoe made the triangular impressions at Cacharelis's house and at the murder scene and the impressions at both locations were consistent with each other. Bodziak also examined shoes previously worn by Cacharelis and Kraybill, and measured Kraybill's feet. Bodziak compared the size of Cacharelis's shoes and Kraybill's feet to the foot size of the footwear impressions at the murder scene and at Cacharelis's house. Bodziak determined that Kraybill's foot size ranged from 8 to 9 and that size was consistent with the general dimensions of the impressions at the murder scene and at Cacharelis's house. Regarding the tire impressions, Bodziak opined that Cacharelis's vehicle with Goodyear GT+4 tires corresponded in tread design, dimension and pitch to the tire impressions left at the murder scene and at Cacharelis's house.

¶ 33      Forensic scientist Kenneth Pfoser examined the leather and plastic gloves recovered at the murder scene. A full DNA match existed between Kraybill and both leather gloves. The chance of an unknown individual having the same DNA profile found on the evidence in this case would be 1 in 174 quadrillion Caucasians. Pfoser acknowledged that an individual's DNA could be found on an object that he never touched because of the phenomenon of transference, whereby an individual can touch one object leaving DNA that is transferred onto another object that the person never touched. Pfoser was unable to recover any DNA from the purple gloves. Both Cacharelis's and Kraybill's DNA were excluded from the DNA profile obtained from the chicken bones and East Bank Club bag located in the garbage can at the murder scene.

¶ 34      Before his retirement, Theatrice Patterson was a latent print examiner for the Chicago police department. Patterson examined the 43 fingerprints recovered from Cacharelis's

vehicle. Patterson concluded that the fingerprint that was obtained from the passenger side of Cacharelis's vehicle matched the print of Kraybill's right middle finger.

¶ 35    During the investigation of Cacharelis's murder, Sergeant James Christensen interviewed Kraybill several times. On March 5, 2003, during an interview with Christensen, Kraybill said Cacharelis "was manipulative, egocentric and cared for no one other than his own self." Kraybill repeated his characterization of Cacharelis during other interviews with Christensen. Kraybill also stated that "you and I both know that at some point I'm going to have to face charges in Illinois." During an interview on March 11, 2003, after Kraybill learned that his fingerprint was found on Cacharelis's vehicle and his DNA was located at the murder scene, Kraybill "stated that perhaps the offender brought along a pistol for nothing more than his own personal protection." Kraybill continued by stating that, "If I tell you guys everything, I want to tell you *** I don't know if I'm ready to make that leap of faith to tell you guys everything and to spend the rest of my life in jail." Kraybill sighed, lowered his head and stated, "I've had a great 40 years, no one can take that away from me." After learning that numerous shell casings were recovered at the murder scene, Kraybill said, "Joel was selfish. I can almost see his last little smirk." Kraybill also said, "it's hard for me to give you guys the whole pie. I might be able to give you a piece of the pie, but I think you guys are going to find out the truth."

¶ 36    Nearly a year later, on February 20, 2004, Kraybill was arrested in Wisconsin and charged with murder. Kraybill spent five weeks in the Dane County Jail in Wisconsin before he was extradited to Illinois. Before his extradition and while he was in jail, Heggesta and Kraybill spoke on the telephone fairly often and their calls were recorded. Heggesta also visited him at the jail and their conversation during the visit was likewise recorded. On February 21, 2004, Heggesta told Kraybill that she received a grand jury subpoena from Illinois. Kraybill referred to the Illinois investigators and detectives as "those jerks from Illinois" and tried to tell Heggesta what to say to those "chumps." On February 22, 2004, Kraybill advised Heggesta to cry the whole time while talking to the Illinois authorities because it is impossible to question someone who is crying. On February 28, 2004, Kraybill told Heggesta to "just say f*** you" to the Illinois authorities regarding his whereabouts on the night of the murder. During conversations on March 14 and March 27, 2004, Kraybill became angry when he learned that Heggesta had provided the authorities with a handwritten statement and accused her of not reading the statement thoroughly and only signing the last page of the statement implying that she did not know what she was signing. Kraybill also implied that she gave the statement under duress. Kraybill told Heggesta that if she was pregnant, he would not receive the death penalty because no jury would convict a man who had a pregnant girlfriend or wife. Kraybill further stated that she may save his life because the jury would unlikely kill him if he had a baby.

¶ 37    Although Kraybill did not testify on his own behalf at trial, his mother testified that when she called Charlotte to express her condolences, Charlotte indicated that Kraybill arrived at her house the previous night at approximately 6:30 p.m. and left at approximately 7 p.m. Kraybill also presented the testimony of the East Bank Club's director of building facilities who stated that the club sold barbeque chicken wings to a club member on the day before the murder and made a second sale to an unidentified individual on the day of the murder at approximately 8:41 p.m.

¶ 38    In its closing argument, the State did not mention evidence regarding the coins found in Kraybill's home or connect them to those in Cacharelis's car. In his closing argument in reference to the coins found in Cacharelis's car, defense counsel stated:

> "Wouldn't it be nice to know where those [coins and jewelry] came from? Did you hear anything? Was there any evidence, was there any follow-up? No, there wasn't. Might that not explain to you what Joe Cacharelis was doing on that lonely road in Winnetka almost at midnight way back then, this private man who believes his phones were tapped who died with $300 in his pocket, but we didn't hear."

In its rebuttal closing, the State responded:

> "Defense made a big deal about what was found on the floor boards of the victim's car. Okay. There are some gold coins on the bottom of his car. We know he wasn't robbed when he was killed, so what do these have to do with anything. I don't know, they are just found in his car. By the way, they are found on the side of the car that the defendant was in on the passenger side. Defendant collects coins. Big deal. We are not saying those coins are his, but again, something that has nothing to do with this crime, like the chicken wings. Was it there? Yes. Did it have any evidentiary value? No. They [the police] collected it anyway."

¶ 39    The jury returned a verdict finding Kraybill guilty of first-degree murder. The jury also found that during the commission of that offense, he personally discharged a firearm that proximately caused the death of another person. The trial court sentenced Kraybill to 65 years' imprisonment. Kraybill filed a motion for a new trial, which the trial court denied. Kraybill timely appealed.

¶ 40                                                      ANALYSIS

¶ 41    On appeal, Kraybill's claims of error all relate to the trial court's rulings on the admission of evidence. The same standards of review apply to each claimed error. A trial court's ruling regarding the admissibility of evidence is reviewed for an abuse of discretion. *People v. Villa*, 2011 IL 110777, ¶ 44; *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). A trial court abuses its discretion where its ruling "is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37. A trial court is charged with the responsibility of determining whether evidence is relevant and admissible. *Morgan*, 197 Ill. 2d at 455. Evidence is deemed relevant "if it has any tendency to make the existence of any fact that is of consequence to the determination of an action either more or less probable than it would be without the evidence." *Id.* at 455-56. It is within a trial court's discretion to reject evidence if the evidence is remote, uncertain or speculative. *Id.* at 456. Evidence is considered speculative if an insufficient nexus exists to connect the offered evidence to the crime. *People v. Makiel*, 263 Ill. App. 3d 54, 70-71 (1994).

¶ 42                          A. Evidence Connecting Cacharelis to Criminal Activity

¶ 43    Kraybill notes Cacharelis was murdered on a desolate road and that stolen property was in his car. Kraybill claims the trial court erred in granting the State's motion *in limine* excluding evidence demonstrating Cacharelis's participation in burglary activities. Kraybill argues this evidence was relevant because it supported his defense that Cacharelis was murdered, not by Kraybill, but by an individual associated with his illegal burglary activities.

¶ 44    We disagree. Kraybill proposed to adduce evidence regarding Cacharelis's burglary activities that consisted of: (1) pending charges against Cacharelis for burglary; (2) a court appearance scheduled for the day after Cacharelis was murdered; (3) Cacharelis's possession of approximately $400,000 in safe deposit boxes at the time of his death; (4) Cacharelis's possession of a stolen ring discovered in his vehicle at the time of his death; and (5) testimony from a neighbor who routinely saw Cacharelis leave in his car late at night. But even considered cumulatively, this evidence does not have a sufficient connection to Cacharelis's murder to be considered relevant. Admitting the evidence identified by Kraybill would not have established any connection between Cacharelis's death and those burglary activities.

¶ 45    Although a defendant in a criminal case may offer evidence that tends to show another individual committed the offense, such evidence is inadmissible as being irrelevant if it is too remote or speculative. *People v. Kirchner*, 194 Ill. 2d 502, 539-40 (2000).

¶ 46    In *People v. Wheeler*, 226 Ill. 2d 92, 133-34 (2007), our supreme court found speculative comparatively more descriptive evidence of another suspect identified by the defendant. In *Wheeler*, the defendant named a specific individual who was the highest ranking Gangster Disciple in Decatur, Illinois, as having a motive to kill the victim. *Id.* at 133. The *Wheeler* court held that the proffered evidence linking the other individual to the murder was speculative because no connection to the murder scene was established, especially where the individual was in prison at the time of the murder, and no evidence was offered that the individual otherwise arranged for the victim's death. *Id.* at 133-34. See also *People v. Fort*, 248 Ill. App. 3d 301, 314 (1993) (finding the defendant's evidence that an individual named "Duke" may have killed the victim was too speculative because no evidence was presented to establish "Duke's" identity, his presence at the murder scene, or his involvement in the murder); *People v. Bruce*, 185 Ill. App. 3d 356, 364, 367 (1989) (finding testimony about whether the victims were involved with drugs and whether they may have been murdered by someone also involved with drugs was too speculative, conjectural and remote because the defendant failed to specifically identify any other person who may have murdered the victims).

¶ 47    Here, Kraybill failed to offer any information regarding the identity of another individual present at the murder scene or involved with Cacharelis who may have murdered him. As the record reveals, Kraybill did argue to the jury that the unexplained presence of coins and jewelry in Cacharelis's car coupled with the recently deposited garbage containing the DNA of someone other than Kraybill or Cacharelis pointed to a perpetrator other than Kraybill. Thus, Kraybill's theory that someone else was responsible for the murder was considered and rejected by the jury. Nothing in the excluded evidence would have made that argument any more persuasive or, for our purpose, any less speculative.

An insufficient connection exists between the evidence relating to Cacharelis's alleged illegal conduct and his death rendering this evidence speculative and inadmissible. Therefore, the evidence was properly excluded.

¶ 48                                                B. Silencer

¶ 49    Kraybill also contends that the trial court erred in allowing the State to inform the jury that authorities seized a .22-caliber silencer from his house among his weapons collection. Kraybill claims that the silencer was inadmissible because no evidence existed connecting

that silencer to the murder or even that a silencer was used during the murder. Kraybill contends that the State unfairly argued that a .22-caliber Beretta handgun that he owned, which theoretically was capable of firing the bullets that killed Cacharelis, was threaded to fit a silencer. Kraybill maintains that the probative value of admitting the silencer in an effort to tie him to the offense was minimal, but the prejudicial impact great given the negative inferences associated with silencers.

¶ 50     Generally, a weapon may not be admitted into evidence unless proof exists connecting it to the defendant and the crime or unless the defendant possessed the weapon when arrested for the crime. *People v. Maldonado*, 240 Ill. App. 3d 470, 478 (1992). Admitting into evidence unconnected weapons is improper because it would arouse the jury and prejudice the defendant. *People v. Evans*, 373 Ill. App. 3d 948, 960 (2007). Thus, weapons not proved to be in the defendant's possession or under his control should not be admitted into evidence. *Id.* A sufficient connection exists where the weapon is suitable for the crime charged, but it need not be shown that it was actually used to commit the crime. *Maldonado*, 240 Ill. App. 3d at 479.

¶ 51     In this case, the State established the required connection between the silencer and Cacharelis's murder. The State offered the following evidence to connect the silencer to Kraybill and the crime: (1) a receipt shows and Kraybill stipulated that he purchased both a silencer and a .22-caliber Beretta model 87 handgun on April 21, 1999, and that the Beretta was threaded to accept the silencer; (2) a .22-caliber weapon was used to murder Cacharelis; (3) the types of .22-caliber ammunition recovered at the murder scene were also the types of ammunition located in Kraybill's house; (4) the Berretta handgun was one of six handguns out of potentially thousands of manufacturers of .22-caliber weapons that could have fired the ammunition recovered at the scene; and (5) despite the remote location of the murder scene, residences were close by and no one called 911 to report hearing repeated gunshots. Based on the foregoing evidence, the State's evidence was sufficient to establish the required connection between the silencer, the crime and Kraybill.

¶ 52     Although Kraybill contends that additional tests could have been performed to determine whether the silencer recovered from his house was actually used to murder Cacharelis, forensic scientist Luckie testified that the actual weapon that discharged the bullets, which was never located, was necessary to accurately perform additional testing of the silencer. Kraybill also contends–for the first time on appeal–that additional testing could have been performed to determine whether the recovered silencer contained the same gunshot residue found near the bullet wounds on Cacharelis's body. Because Kraybill failed to raise this contention during trial, we will not consider it for the first time on appeal. *People v. Robinson*, 167 Ill. 2d 397, 404 (1995).

¶ 53     Kraybill relies on *Maldonado* and *People v. Babiarz*, 271 Ill. App. 3d 153 (1995), but both cases are distinguishable. In each of these cases, the weapons admitted into evidence were not "suitable" for the commission of the offense with which the defendant was charged, one because it was a different type of weapon altogether (*Maldonado*, 240 Ill. App. 3d at 479) and the other because the caliber of the weapon recovered did not match the bullets recovered from the victim's body (*Babiarz*, 271 Ill. App. 3d at 160). The evidence here established that the silencer that Kraybill owned was threaded to fit the Berretta handgun that he also owned and that the Berretta was the same type of weapon used to fatally shoot

Cacharelis. Thus, the trial court did not abuse its discretion by ruling that the silencer discovered at Kraybill's house was admissible.

¶ 54                    C. Conversations With Sergeant Christensen

¶ 55    Kraybill next claims that the trial court erred in finding both that Sergeant Christensen's alleged violation of the investigatory note disclosure law and his tape-recorded conversation with Kraybill in 2004 were inadmissible. Kraybill claims Christensen's destruction of his investigatory notes revealed his bias as a witness. Kraybill also claims the tape recording of the 2004 conversation was relevant because, in reference to the 2003 conversations, he denied stating: (1) he knew he would be facing charges in Illinois; (2) he would give the investigating officers a "piece of the pie;" and (3) he did not know if he was ready to make that leap of faith to tell the authorities everything and spend the rest of his life in jail. According to Kraybill, he maintained his innocence during the tape-recorded conversation and asserted his belief he would not receive a fair trial because the investigating authorities were interjecting words into his statements or lying.

¶ 56    During oral arguments, defense counsel asserted the 2004 conversation was relevant because Kraybill explained the meaning of his 2003 statements that were admitted into evidence through Christensen's testimony. Specifically, Kraybill explained he was not referring to facing charges in Illinois for Cacharelis's murder, but was referencing his attorney attempting to reach a deal with Illinois authorities related to gun charges and getting his guns back. Kraybill also explained when he said the perpetrator may have brought a gun for his own personal protection, he was merely speculating about how the murder may have occurred, "like we were cops or something." Regarding the "piece of the pie" statement, Kraybill explained he did not state he would not give the authorities the whole thing because he would go to prison, but that he would help them out as much as a "piece of pie." Kraybill claims the tape recording should have been admitted even though Christensen did not discuss the recorded interview during trial because the jury would learn Kraybill's version of what transpired during prior interviews.

¶ 57    We reject Kraybill's claim that the trial court abused its discretion by precluding the questioning of Christensen about notes he took of his interview with Kraybill. According to Kraybill, the testimony was relevant because Christensen's destruction of interview notes violated section 114-13(b) of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/114-13(b) (West 2004)), which became effective on November 19, 2003. Section 114-13(b) precludes the destruction of interview notes in homicide cases and requires the notes to be given to the prosecuting authorities. *Id.* Kraybill claims that cross-examining Christensen regarding the interview notes would have revealed his bias, interest and motive to testify falsely. We disagree.

¶ 58    First, Kraybill never established that a violation of this provision occurred. Christensen's conversations with Kraybill occurred in February and March 2003, shortly after Cacharelis's murder. Christensen testified that he did not take notes during these conversations, that he and another detective memorialized their recollection of the conversations after each one of them and ultimately incorporated their notes into a formal police report. The report regarding these conversations is dated March 6, 2003. Christensen testified that once he prepared the formal report, he destroyed the notes. Thus, nothing in the foregoing scenario establishes a violation of section 114-13(b), which did not become effective until months later.

¶ 59    Further, with respect to Christensen's investigation after November 2003, it was beyond the scope of his direct examination and, consequently, the trial court had discretion to preclude this inquiry. In any event, Kraybill has not provided evidence that Christensen took notes during any interview after November 2003 and if and when those notes would have been destroyed. Nothing in the record reveals that Kraybill requested this information in pretrial discovery. Consequently, the predicate for the proposed cross-examination of Christensen–an alleged violation of section 114-13(b)–has not been shown to exist.

¶ 60    Moreover, the testimony Kraybill hoped to elicit through Christensen is inadmissible. As noted above, Christensen did not testify on direct examination about the investigative steps he took after November 2003, when the law became effective. Nonetheless, Kraybill sought to elicit testimony regarding a 2004 conversation he had with Christensen ostensibly to show that Christensen destroyed notes of his conversations with Kraybill. Kraybill failed to sufficiently explain how expanding the scope of Christensen's cross-examination to address post-2003 investigative steps would discredit him or show his bias; likewise, Kraybill failed to demonstrate the relevance of that testimony or the prejudice he would suffer absent that testimony. See *People v. Lewis*, 223 Ill. 2d 393, 404 (2006) (recognizing that the limitation on the scope of cross-examination is liberally construed to permit inquiry into subjects tending to explain, discredit, or destroy the witness' testimony on direct examination). Here, no basis in the record exists to conclude that the trial court abused its discretion in limiting Kraybill's cross-examination of Christensen to preclude questioning of investigative steps taken in 2004.

¶ 61    We also disagree with Kraybill that the trial court erred in granting the State's motion *in limine* precluding discussion of the 2004 interview between Kraybill and Christensen during which Kraybill denied either making the statements or the meaning attributed to those prior statements. The State sought to preclude, as inadmissible hearsay, the conversation Kraybill had with Christensen on February 21, 2004, when Christensen was recording the conversation unless either the State raised that conversation on Christensen's direct examination or Kraybill decided to testify on his own behalf. We agree with the State that Kraybill's statements were inadmissible hearsay.

¶ 62    The mere fact that Kraybill's 2004 statements were recorded and that he could lay a foundation for the recording does not render his proposed use of otherwise inadmissible hearsay statements proper. The State's use of Kraybill's statements was admissible under the admissions by party opponent exception to the hearsay rule. *People v. Kidd*, 175 Ill. 2d 1, 29 (1996). In contrast, Kraybill's desired use of his own exculpatory statements to Christensen does not fall within a recognized exception to the rule against hearsay; rather, "[s]elf-serving statements by an accused are inadmissible hearsay." *People v. Patterson*, 154 Ill. 2d 414, 452 (1992). Self-serving statements "are considered inadmissible hearsay because their relevance depends upon the truth of the matter asserted or the declarant's belief in the truth or falsity of the matter asserted." *Id.*

¶ 63    Kraybill sought to admit statements he made to Christensen in 2004 to contradict his earlier statements and establish his belief that the authorities were trying to frame him. Kraybill's intended use of the statements was self-serving and, therefore, inadmissible. For these reasons, the cases that Kraybill cites as support for the introduction of his statements into evidence are readily distinguishable because the relevant statements were first introduced into evidence by the prosecution and not the defendant. See *People v. Theis*, 2011

IL App (2d) 091080, ¶ 32 (defendant asserted that a videotaped police interview was erroneously admitted as hearsay); *People v. Griffin*, 375 Ill. App. 3d 564, 570 (2007) (defendant asserted that the taped conversation was erroneously introduced); *People v. Harvey*, 95 Ill. App. 3d 992, 998 (1981) (prosecution offered tapes as evidence). Consequently, because Kraybill, and not the State, sought to introduce the tape recording into evidence to support his defense, the trial court did not abuse its discretion in granting the State's motion *in limine* barring introduction of the taped conversation into evidence. The substance of Kraybill's 2004 statements did not explain the earlier interviews or put prior statements in context; they were merely contradictory statements attempting to bolster his defense.

¶ 64    Although Kraybill argues his statements during the 2004 interview were relevant and necessary to explain statements made during the 2003 interviews, this contention alone does not equate to a claim that either the completeness doctrine or Illinois Rule of Evidence 106 (eff. Jan. 1, 2011) applies. Kraybill's cursory reference to a completeness argument in his opening brief lacks citations to relevant legal authority and the issue is not fully developed. Consequently, any argument relating to the application of the completeness doctrine and Rule 106 is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013). See *People v. Sanchez*, 169 Ill. 2d 472, 500 (1996) (declining review of contentions not supported by argument or authority).

¶ 65    Forfeiture aside, both the completeness doctrine and Rule 106 are inapplicable. Under the common law completeness doctrine, the *remainder* of a writing, recording or oral statement is admissible to prevent the jury from being mislead, to place the admitted evidence in context to convey its true meaning or to shed light on the meaning of the admitted evidence. *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 42. Because Kraybill seeks to admit statements made during an entirely different interview, the completeness doctrine does not apply. Rule 106 codified, in part, the completeness doctrine and provides: "When a *writing or recorded statement* or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." (Emphasis added.) Ill. R. Evid. 106 (eff. Jan. 1, 2011); *Craigen*, 2013 IL App (2d) 111300, ¶ 42. Based on Rule 106's express language, either a written or recorded statement must be introduced by a party in order for an adverse party to invoke the rule to admit the remaining portion or another written or recorded statement. Kraybill seeks to admit the 2004 recorded interview to explain oral statements he made during the 2003 interviews. The State did not introduce any written or recorded statements of the 2003 interviews. For this reason, Rule 106 is also inapplicable. Consequently, for the reasons stated, the 2004 tape recorded interview was inadmissible and the trial court did not err in excluding it from evidence.

¶ 66                                D. Collector Coins

¶ 67    Finally, Kraybill claims the trial court ruled inconsistently in excluding evidence of Cacharelis's criminal activities and possession of stolen property when he was murdered while admitting photographs of collector coins discovered inside Kraybill's house. Kraybill contends that the photographs of the collector coins unfairly linked him to the coins recovered underneath the floor mats on the passenger side of Cacharelis's vehicle. Kraybill also claims that he was prejudiced by the State's rebuttal closing argument because it invited

the jury to infer that Kraybill possessed the coins and left them in Cacharelis's vehicle despite the lack of evidence supporting such a contention. Lastly, Kraybill claims that the State's rebuttal closing argument was prejudicial because it alluded to a motive for Cacharelis's murder and tied Kraybill to criminal activity apart from the pending charges.

¶ 68     We agree with Kraybill that the photographs of the collector coins found in his home were not relevant. The State sought to connect the photographs of the collector coins to Kraybill and the murder by inferring that because coins similar to those found in Kraybill's home were discovered on the passenger side of Cacharelis's vehicle, Kraybill was responsible for placing them there. But the State never established this connection by, for example, showing that coins were missing from the coin catalogues discovered in Kraybill's home. Any probative value associated with the photographs of the collector coins was minimal, at best. Moreover, the State, in essence, conceded in its rebuttal closing argument that the collector coins were irrelevant. Thus, the trial court erroneously admitted the photographs of the collector coins into evidence.

¶ 69     As we have rejected Kraybill's other claims of error, we must consider whether this single error in his trial warrants reversal. When reviewing an error to determine whether it is harmless, this court may "(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *People v. Becker*, 239 Ill. 2d 215, 240 (2010) (citing *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008)). An error does not require reversal of a conviction unless it appears that real justice has been denied or the jury's verdict may have resulted from the error. *People v. Tranowski*, 20 Ill. 2d 11, 17 (1960). In a criminal case, a defendant is entitled to a fair trial, but not a perfect one. *People v. Herron*, 215 Ill. 2d 167, 177 (2005). Where the record reveals that the jury's verdict is supported by properly admitted evidence, errors in the admission of evidence do not warrant reversal. *Tranowski*, 20 Ill. 2d at 17.

¶ 70     Reviewing the record, we conclude that the evidence properly admitted into evidence proves Kraybill guilty beyond a reasonable doubt and demonstrates that no fair minded jury could have reasonably found him not guilty. The evidence as we have summarized it above overwhelmingly supports the jury's verdict. Kraybill's connection to Cacharelis and the type of weapon and ammunition used to murder him, his presence at the Cacharelis home just hours before Cacharelis was murdered, the fingerprint, footprint and DNA evidence and, finally, his own words to Christensen and to his girlfriend all point to his guilt. On this record, particularly since the State suggested to the jury that it should ignore evidence regarding the coins, we are confident that the single error we have identified did not influence the jury's verdict.

¶ 71                                           CONCLUSION
¶ 72     For the reasons stated, we affirm Kraybill's convictions.

¶ 73     Affirmed.