2023 IL App (1st) 220828-U

No. 1-22-0828

Order filed November 9, 2023

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the<br>) Circuit Court of |
| Plaintiff-Appellee, | ) Cook County. |
| v. | ) No. 19 CR 9852 |
| RODNEY JONES, | ) Honorable<br>) Vincent M. Gaughan, |
| Defendant-Appellant. | ) Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not abuse its discretion in sentencing defendant to 18 years in prison for second degree murder. Counsel was not ineffective for failing to preserve the sentencing issue and defendant cannot establish plain error.

¶ 2   Following a jury trial, defendant Rodney Jones was found guilty of second degree murder and sentenced to 18 years in prison. On appeal, Jones contends that his sentence is excessive because the trial court did not give sufficient weight to the evidence in mitigation. Jones further

argues that, although this issue was forfeited for review, his sentence constitutes plain error and counsel was ineffective for failing to preserve the issue. We affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4     Jones was charged by indictment with multiple counts of first degree murder following a July 26, 2018 incident where Sid Taylor Jr. (Taylor) was fatally shot.

¶ 5     The defense filed a Lynch motion *in limine* to admit evidence of Taylor's propensity to act as an aggressor. See *People v. Lynch*, 104 Ill. 2d 194 (1984). Jones alleged that in the weeks prior to the shooting, Taylor argued with Kevin "Cookie Monster" Smith before drawing a firearm and aiming it at Smith. The incident ended when Jones "tackled" Taylor. Following argument, the trial court granted the motion.

¶ 6     At trial, Taylor's cousin Antonio Bennett testified that on the evening of July 25, 2018, he, Taylor, and others were celebrating Taylor's birthday on the stoop of Bennett's neighbor's home. Jones arrived uninvited and "immediately" began "talking crazy" to Taylor. Bennett identified Jones, with whom he had grown up, in court. Bennett explained that Taylor and Jones had a "thing" where they would "talk crazy" to each other in a "joking" manner. This continued for 5 to 10 minutes, and Taylor, who had a "smirk," was not bothered. When Bennett noticed that Taylor and Jones were no longer joking, Bennett and another man, Ismael, tried to deescalate the situation.[2] However, Jones did not "let *** up" and was "speaking his piece." Ismael approached Jones and asked him to "walk off." Bennett tried to prevent Taylor from becoming upset, and Jones eventually walked away.

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2]The record does not indicate Ismael's surname.

¶ 7 Approximately 10 minutes later, Jones returned and "picked right up" arguing with Taylor. Things became "more intense," and Taylor stood up. Bennett grabbed Taylor and held him. Meanwhile, Ismael held Jones and "plead[ed]" with him to "just leave it alone." Jones then stepped closer and pushed Taylor against a gate. Taylor got up and said jokingly that Jones's "big ass" needed a hug. Taylor approached Jones "face to face," threw his hands up, and "took off." Jones followed. Bennett then saw a flash and realized that Jones was shooting at Taylor. He did not see Taylor draw a firearm; rather, Taylor was running away. Bennett saw seven flashes. Taylor stumbled, fell, and then crawled to a neighbor's house. Eventually, Jones stood over Taylor, who was facedown on the ground, and fired again. Jones then "speed" walked away. Bennett held Taylor until an ambulance arrived. Later, the police came to Bennett's home, but he did not speak to them, as he was "angry and confused." However, he subsequently viewed a photographic array and identified Jones as the shooter.

¶ 8 During cross-examination, Bennett testified that the party began at 4 p.m. on July 25, 2018, and that the shooting occurred between midnight and 1 a.m. on July 26. Taylor arrived around midnight. Bennettt did not know whether Taylor was "high." However, Taylor did not drink alcohol at the party. During the encounter by the stoop, Bennett held Taylor so that Taylor would not approach Jones, but he let go of Taylor after he calmed Taylor down and thought it was "safe." Taylor then approached Jones to give him a "bear hug" and "laugh it off." Taylor's back was to Bennett, and Bennett acknowledged that he did not see whether Taylor was motioning to his waistband or making threatening gestures. Bennett grabbed Jones by the collar and tried to pull him back as Jones fired the weapon.

¶ 9    At the time of trial, State's witness Shamar Jones was in custody for failure to appear in this case. Shamar testified that he previously pled guilty to two counts of attempted vehicular hijacking and was currently on parole.[3] He denied knowing Taylor, Bennett, and Jones. When asked if Jones was in the courtroom, Shamar replied, "I don't know."

¶ 10    Shamar remembered testifying before the grand jury on January 15, 2019, but did not remember what he testified to. Shamar acknowledged identifying a photograph of Taylor before the grand jury but stated that he was instructed to do so by an assistant State's attorney (ASA) and another person. Shamar denied being present on the 5200 block of South Peoria Street on July 26, 2018. He denied seeing Jones, Taylor, and Bennett. He asserted that he was "locked up" at the time of incident, "was peer pressured" into testifying, and did not know "anything about nothing." When asked if he testified before the grand jury that he was present and saw Jones, Taylor, and Bennett on that date, Shamar averred that he did not know. Shamar contended that what he told the grand jury was not true.

¶ 11    During cross-examination, Shamar testified that he was not related to Jones, but they grew up together. He did not remember telling police officers, while in custody on January 4, 2019, that he had information about Taylor's death and would testify in exchange for help with his pending charges.

¶ 12    ASA Robert Mack testified he interviewed Shamar about the shooting prior to Shamar's testimony before the grand jury. A Chicago police officer was present for part of the conversation, and Mack also spoke to Shamar alone. Mack read portions of Shamar's grand jury testimony into

_____

[3]Shamar and defendant are not related to each other. As they share a surname, however, we refer to Shamar by his first name to avoid confusion.

the record, including that on July 25, 2018 (1) Shamar was present with Jones, Taylor, and Bennett; (2) Jones, Taylor, and a woman, Angie,[4] argued; (3) Jones and Taylor fought; and (4) Jones drew a firearm and shot Taylor. Mack denied that Shamar stated he was forced to testify.

¶ 13    During cross-examination, Mack acknowledged that Shamar was in custody at the time of his grand jury testimony, but Mack did not remember him wearing handcuffs. Mack spoke to Shamar for 30 minutes before Shamar testified. Mack could not recall which reports he read prior to the meeting.

¶ 14    Chicago police detective Shaun Fletcher testified that during his investigation, Bennett provided the names of approximately eight individuals whom Fletcher further investigated. The investigation led to a suspect, and Fletcher thereafter placed Jones's photograph in a photo array, which other detectives showed to Bennett.

¶ 15    At one point, Fletcher learned Jones had been arrested, and thereafter spoke to Jones at a police station. Jones stated that he lived with his grandmother in the 800 block of West 51st Place. The shooting occurred in the 5200 block of South Peoria Street, about a block away. Fletcher also met with Shamar, who was in custody on an unrelated matter. He did not threaten Shamar or make any promises to facilitate the conversation.[5] During the investigation, Fletcher learned that Jones was 5'11'' in height and weighed around 300 pounds.

¶ 16    During cross-examination, Fletcher denied that Shamar offered "to close [the] case" for him on January 4, 2019. However, Shamar told other detectives that he could "close the case."

---

[4]The transcript does not contain Angie's last name.

[5]Although the transcript reflects that the State questioned Fletcher about a January 14, 2018 conversation with Shamar, we assume the use of that date was a scrivener's error, as the shooting occurred in July 2018.

¶ 17    The State presented further testimony establishing that a 10-inch flathead screwdriver and seven fired cartridge cases from a 9-millimeter firearm were recovered from the crime scene, and that an Illinois State Police forensic scientist concluded that all seven cartridges were fired from the same firearm. Additional testimony established that Taylor was six feet tall and 157 pounds at the time of his death, and that his cause of death was multiple gunshot wounds, including a penetrating gunshot wound to the back.

¶ 18    Jones testified that he was 47 years old at the time of trial. In 2013, Jones plead guilty to felony theft and was sentenced to 24 months of probation. At 6 p.m. on July 26, 2018[6], he went to a gathering at 52nd and Green Streets, about 1½ to 2 blocks from his home. Bennett, whom Jones characterized was "like a little brother," was present "[o]ff and on" at the gathering.

¶ 19    Later that evening, a vehicle drove by. Taylor, whom Jones had known for more than 10 years, leaned out of the front passenger window holding a firearm. A week before the gathering, Jones was walking down Peoria when he observed Taylor arguing with another man, Brian, also known as "Cookie Monster."[7] Taylor punched Brian and drew a firearm. Jones walked past the men without doing anything.

¶ 20    Jones left the gathering around midnight and walked toward Peoria because Bennett invited Jones to share some vodka. Bennett's home was about a block away through an alley. When Jones arrived, around 10 people were sitting on the stoop next to Bennett's home, drinking alcohol and smoking cigarettes and marijuana. As soon as Jones arrived, he and Taylor went "at it." Jones was

_____

[6]Although the transcript reflects that defense counsel questioned Jones regarding his whereabouts on the afternoon of July 26, 2018, we assume the use of that date was a scrivener's error, as the shooting occurred in the early morning hours of July 26, 2018.

[7]During cross-examination, Jones initially testified that Brian's last name was "Cook or something of that nature," but then testified that he did not know Brian's last name.

holding a cup of vodka and had drunk about a "fifth" of alcohol that day. Taylor stated, "you n***
on Green don't run nothing over here on Peoria." Jones explained that the "guys" who lived on
Peoria were upset that "guys" who lived on Green were "hanging out" on Peoria. This was not the
first time that Taylor raised this issue with Jones. Jones responded, and the two men argued. Taylor
stood and tried to "get" Jones. However, Bennett stopped Taylor and looked back at Jones. Jones
interpreted this as a request to remove himself from the situation so that Bennett could deescalate
it. Jones walked to a gangway and conversed with Angie.

¶ 21    As Jones and Angie spoke, Taylor approached and restarted the argument. Jones then
walked toward Bennett's gathering. Taylor, who followed Jones, was "aggressive" and wanted "to
fight." Jones tried to deescalate the situation. At one point, Jones turned around and Taylor said
things like, "You ain't on nothing," "What you were saying," and "Show me I'm a crackhead."
Jones replied, "Man, you ain't on nothing," and turned to walk away. Taylor then punched Jones
in the mouth and jaw. Jones drew a firearm which he had put in his pants pocket earlier that day.
Taylor reached to his waist area and Jones thought Taylor was "finna shoot me," so Jones fired.
Although Jones did not see Taylor with a firearm at that time, he feared for his life, because he
previously saw Taylor draw a firearm and punch someone. Taylor turned away as though he was
"still reaching," so Jones continued to fire. He did not count the shots, as everything happened "so
fast." Jones explained that he shot to keep Taylor from "reaching for whatever he was reaching
for." After Taylor fell to the ground, Jones walked away. He later learned that Taylor died.

¶ 22    Thereafter, Jones took the train to Peoria, Illinois, because he was receiving death threats.
He then went to Memphis, Tennessee for five to six months, before returning to Peoria. He did not
return to Chicago because he feared for his life. He was arrested in Peoria and transported to

Chicago. After his arrest, he spoke to police officers but did not tell them what happened because he did not trust officers and was afraid his words would be "twisted." Instead, Jones asked for an attorney. Jones did not put his hands on Taylor nor did he plan to shoot him. Rather, Jones carried a firearm because of where he lived and the things that he had seen. He was afraid because he knew Taylor "had a gun" and the situation escalated. Jones would not have fired had Taylor not reached for his waistband.

¶ 23    During cross-examination, Jones stated he disengaged the safety on the firearm when he drew it and that he feared for his life at the time of the first shot through the seventh shot. He had possessed the firearm, a 9-millimter Ruger, for months and threw it away the day after the shooting. He admitted calling Taylor a "crackhead." Jones asserted that Taylor started the argument. He denied that Taylor raised his hands and did not hear Taylor express an interest in hugging him. Jones did not fire at Taylor when Taylor was on the ground; rather, Taylor stood the entire time. Taylor started to run away as Jones fired.

¶ 24    Jones told police officers that he did not know where the shooting occurred and that he did not know "anything" about it. The State then played video clips from Jones's interview with the police.[8] At trial, Jones acknowledged that he laughed when speaking to the police and told police that he did not hear about the incident until "days later." He did not report the death threats to the police. Jones was not scared when he saw Taylor leaning out of a vehicle with a firearm because that was how Taylor "normally" acted and the conduct was not directed at Jones. However, Taylor

---

[8]The State did not seek to admit the video clips into evidence at this point of the trial. A DVD of the clips is included in the record on appeal.

had a problem with everyone on Jones's block. Although Jones and Taylor had "issues," they did not argue all the time and Jones did not have a problem with Taylor the night of the shooting.

¶ 25    During redirect, Jones testified that when Bennett invited him over for a drink, Bennett did not state that Talyor would be present. He told the police that he knew nothing about the shooting and was not present because he was afraid and did not trust the police. He told the police they might twist his words and asked for an attorney. Although Taylor told Jones not to "go over there," that is, be present on Peoria, Bennett never did. Taylor was taller than Jones. Jones did not draw the firearm until after Taylor struck him twice and did not decide to fire until Taylor appeared to reach for something. Jones believed that Taylor was reaching for the firearm that Jones observed earlier.

¶ 26    The defense entered a stipulation that if called to testify, Officer Ritter and Detective Balcik would testify that they spoke to Shamar on January 4, 2019, in the Ninth District lockup.[9] They would further testify that although Shamar initially stated that he heard about Taylor's murder "on the street," he then stated that he was present, could "close the case," and requested his attorney be contacted to see if he could be "help[ed]" on his current charges.

¶ 27    The State then entered a stipulation that certain videos were true and accurate recordings of Jones's interview with police in June 2019. The court then stated that the "stipulation is allowed and moved into evidence."

¶ 28    Following closing arguments, the jury was instructed as to first and second degree murder. The jury found Jones guilty of second degree murder. Jones filed a motion and supplemental motion for a new trial, which the trial court denied.

---

[9]The transcript does not contain Ritter's and Balcik's first names or their police departments.

¶ 29    The presentence investigation (PSI) report revealed that Jones had two prior convictions for possession of cannabis and two prior convictions for the receipt, possession, or sale of a stolen vehicle. Jones also had convictions for possession of a firearm by a felon, aggravated battery, "Obstruct Justice," "Obstruct Peace," attempted murder, and attempted aggravated carjacking.[10] These convictions occurred between 1992 and 2013. Jones was raised by his mother, obtained a GED, was previously employed, and had a good relationship with his two children. Jones was arrested twice for domestic battery, but neither case resulted in a conviction. Jones, who previously lived with his grandmother, was a social drinker and denied using illegal drugs. Jones formerly belonged to a gang but left in 2006.

¶ 30    At sentencing, the State read four victim impact statements into the record. First, Taylor's niece wrote that Taylor was "the life of the party," always let his family know how much he loved them and was missed. Next, a second niece wrote that her heart was "ripped" from her chest by Taylor's death, as he understood her, never judged her, and took her secrets to the grave. She further stated that Taylor was killed by someone who was supposed to be his friend but was "truly a snake." Next, Taylor's nephew wrote that Taylor had a "smile that could light up a room," and loved all members of the family. Finally, Taylor's mother wrote that he was loving and a "master storyteller," and that her life would not be the same without him.

¶ 31    The State then argued that Jones's criminal history spanned nearly 30 years, beginning in the 1990s with two convictions for possession of a stolen motor vehicle and a conviction for attempted first degree murder. Thereafter, Jones was convicted of battery in 2000 and possession

_____

[10]The PSI also lists a conviction for "CDTP," but does not define that term, and a conviction for possession of 30-500 grams, without identifying the substance at issue.

of a weapon by a felon in 2005.[11] The State concluded that Jones had demonstrated that he was not interested in rehabilitation and warranted the maximum sentence of 20 years in prison.

¶ 32    In mitigation, the defense presented Jones's certificate of completion of an "infectious control and sanitary training" course conducted by the Cook County Sheriff's Department. Trial counsel argued that Jones was "honest," consistently stated that he believed that his life was in danger, and "admitted" that he committed second degree murder. Counsel argued that Jones wanted to take responsibility for his actions and believed that he did what was necessary to "save his life."

¶ 33    In allocution, Jones apologized to members of the Taylor family, "from the bottom of [his] heart." Jones denied having a "malicious intent" or going "over there to get into it with [Taylor]," and acknowledged reacting "out of fear."

¶ 34    The trial court stated that it had reviewed the PSI, listened to the evidence in aggravation and mitigation, and reviewed the statutory provisions in aggravation and mitigation, as well as the "nonstatutory provisions in mitigation." The victim impact statements reflected that the Taylors were a "wonderful family," and Taylor was a "wonderful person." The court further noted that the jury found that the elements of first degree murder were proven beyond a reasonable doubt, but also that there were mitigating factors which the defense proved by a preponderance of the evidence, which resulted in a guilty finding for second degree murder. The court stated that Jones could have avoided the situation by taking 10 to 15 seconds to consider "what [was] happening." Instead, Taylor was dead. Therefore, the trial court sentenced Jones to 18 years in prison.

---

[11]The PSI indicates that the aggravated battery proceeding had a 2000 case number and a 2001 disposition date.

¶ 35    Jones then filed a motion for reconsideration and rehearing, seeking "compensatory good time credit" based on his work in jail. The trial court granted the motion for reconsideration, awarded Jones additional presentence custody credit, and corrected the mittimus.

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, Jones contends that his 18-year sentence for second degree murder is excessive when the trial court did not give sufficient weight to the evidence in mitigation. He further argues that he is unlikely to reoffend, noting that the jury determined that the instant offense was "prompted" by his unreasonable belief that he needed to defend himself. Jones acknowledges that he has forfeited this issue on appeal for failure to raise it in a postsentencing motion. However, he requests that this court review the issue pursuant to the plain error doctrine. In the alternative, Jones contends he was denied effective assistance by trial counsel's failure to preserve the issue.

¶ 38    The plain error doctrine permits a reviewing court to consider unpreserved error when (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 39    In the sentencing context, a defendant must show that an error occurred and either (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious that it denied the defendant a fair sentencing hearing. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The first step in plain error review is to determine whether an error occurred. See *People v. Hood*, 2016 IL 118581, ¶ 18 A defendant bears the burden to establish plain error. *Thompson*, 238 Ill. 2d at 613. Whether plain error arose is a question of law reviewed *de novo*. *People v. Johnson*, 238 Ill. 2d 478, 485 (2010). Thus, we first consider whether there was a clear or obvious error.

¶ 40 When determining a sentence, "the trial court has broad discretionary powers." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). We give substantial deference to the trial court because "the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. Accordingly, a sentence will not be disturbed absent an abuse of discretion. *Stacey*, 193 Ill. 2d at 209-10. An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Johnson*, 347 Ill. App. 3d 570, 574 (2004).

¶ 41 The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. When balancing "the retributive and rehabilitative purposes of punishment, the trial court must carefully consider "all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). Where a sentence falls within the statutorily mandated guidelines, it is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. A sentence within statutory limits will be deemed "excessive" and an abuse of discretion when it is "greatly at variance with the spirit and purpose of the law" or is "manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. Absent some indication to the contrary, other than the sentence itself, a reviewing court presumes the trial court considered all mitigating evidence

presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. A defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense. *People v. Reed*, 2018 IL App (1st) 160609, ¶ 62.

¶ 42    Here, Jones was found guilty of second degree murder, a Class 1 felony (720 ILCS 5/9-2(a), (d) (West 2018)) with a sentencing range of 4 to 20 years' incarceration (730 ILCS 5/5-4.5-30(a) (West 2018)). Because Jones's 18-year sentence falls within the statutory guidelines, we presume it is proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 43    Notwithstanding, Jones argues that the sentence is excessive given the unique circumstances of the case. He contends that the jury's finding that he was guilty of second degree murder credited his belief that he acted in self-defense and that he is unlikely to reoffend. He further asserts that the trial court did not afford sufficient weight to the evidence in mitigation, including his (1) lack of recent criminal history, (2) remorse, (3) education, (4) previous employment, (5) supportive family, and (6) potential for rehabilitation. Jones asks this court to reduce his sentence or, in the alternative, to vacate his sentence and remand for resentencing.

¶ 44    As mentioned, absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigation evidence presented. *Sauseda*, 2016 IL App (1st) 140134, ¶ 19. That presumption may be overcome by "affirmative evidence" that the sentencing court failed to consider factors in mitigation. *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27. In this case, Jones has not identified such evidence.

¶ 45    At sentencing, the trial court stated that it reviewed the PSI, listened to the evidence in aggravation and mitigation, and reviewed the statutory provisions in aggravation and mitigation, as well as the "nonstatutory provisions in mitigation." See *People v. Babiarz*, 271 Ill. App. 3d 153,

164 (1995) ("Where the sentencing court examines a presentence report, it is presumed that the court considered the defendant's potential for rehabilitation."). While Jones alleges that the trial court "left little record" for assessing the "propriety" of his sentence, a "court need not recite and assign a value to each factor it has considered." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38; see also *Sauseda*, 2016 IL App (1st) 140134, ¶ 22 ("a trial court is not required to specify on the record the reasons for a defendant's sentence").

¶ 46    Moreover, although Jones argues that the facts of the case were "very mitigating" as reflected in the finding of guilt as to second degree murder, he relies on no authority for the proposition that a jury's finding of guilt as to second degree murder as opposed to first degree murder, in and of itself, may be considered evidence in mitigation at sentencing. Also, although Jones asserts that the "unique" circumstances of the case mean he is unlikely to reoffend, the most important factor in sentencing, as Jones concedes, involves the seriousness of an offense, not mitigating evidence. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123.

¶ 47    Jones further argues that his 18-year sentence was not "justified" by his criminal history when three of his eight felony convictions occurred when he was a young adult, and five were committed when he belonged to a gang. He asserts that reducing his sentence is appropriate considering his potential for rehabilitation, family ties, education, and work history. Finally, Jones notes that he took responsibility for Taylor's death and apologized for his actions.

¶ 48    Here, trial counsel argued in mitigation that Jones was an "honest" client who consistently asserted he did what was necessary to save his life and wanted to take responsibility for his actions. Moreover, the PSI set forth information regarding Jones's family life, education and employment, as well as a criminal history dating back to 1992. See *People v. Evangelista*, 393 Ill. App. 3d 395,

398-99 (2009) (noting that "criminal history alone" may "warrant sentences substantially above the minimum"). Jones identifies nothing in the record, other than the fact that a shorter sentence was not imposed, as support for his argument that the trial court did not consider the mitigating evidence presented. Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigation evidence presented. *Sauseda*, 2016 IL App (1st) 140134, ¶ 19. While a sentence should reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship (*People v. Jones*, 2015 IL App (1st) 142597, ¶ 38), the most important factor in sentencing, as noted, involves the seriousness of an offense (*Harmon*, 2015 IL App (1st) 122345, ¶ 123). Moreover, the existence of mitigating factors does not require the minimum sentence or prohibit the maximum sentence. *Id*.

¶ 49    Essentially, Jones asks this court to reweigh the evidence and agree with his conclusion that a lesser sentence is more appropriate. This we cannot do. See *People v. Fern*, 189 Ill. 2d 48, 53 (1999) ("In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently."). Based on the record before us, we cannot say the trial court's imposition of an 18-year sentence was an abuse of discretion. See *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶ 24 ("The balance to be struck amongst the aggravating and mitigating factors is a matter of judicial discretion that should not be disturbed absent an abuse of discretion.").

¶ 50    As Jones has failed to establish error, there can be no plain error and his procedural default of this claim must be honored. *Hood*, 2016 IL 118581, ¶ 18; see also *People v. Williams*, 2017 IL App (1st) 150795, ¶ 40 ("There was no error, let alone 'plain' error, and so we need not go further in the plain error analysis.").

¶ 51    For the same reason, Jones's contention that he was denied effective assistance because trial counsel failed to raise an excessive sentencing claim in a postsentencing motion must fail. A defendant alleging ineffective assistance must prove prejudice, such that "absent counsel's deficient performance there is a reasonable probability that the result of the proceeding would have been different." *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984)). As the trial court did not abuse its discretion, Jones cannot demonstrate a reasonable probability that his sentence would have been different had trial counsel raised this issue in a postsentencing motion. See, *e.g.*, *People v. Brown*, 2017 IL App (1st) 142877, ¶ 66 (counsel was not ineffective for failing to file motion to reconsider sentence where there was no reasonable probability that the sentence would have been different had the motion been filed).

¶ 52                                    III. CONCLUSION

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.